# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3619

_____

|  |  |  |
|---|---|---|
| Richard T. Palmisano, II, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District of |
| Allina Health Systems, Inc., | * | Minnesota. |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted:  June 16, 1999

Filed:   September 10, 1999

_____

Before LOKEN and MAGILL, Circuit Judges, and JONES,* District Judge.

_____

LOKEN, Circuit Judge.

In 1994, Allina Health Systems, Inc. ("Allina"), conducted a three month investigation and concluded that serious billing improprieties had taken place at the Minneapolis Psychiatric Institute ("MPI"), a wholly owned Allina subsidiary, and that Richard Palmisano, Vice-President of Allina's Behavioral Health Services division and a director of MPI, knew or should have known of the improprieties. Palmisano was

_____

*The HONORABLE JOHN B. JONES, United States District Judge for the District of South Dakota, sitting by designation.

forced to resign. He commenced this action in state court, asserting claims for defamation and breach of contract. The court granted summary judgment in favor of Allina but permitted Palmisano to amend his complaint to add a claim for severance benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Allina then removed the case to federal court. After trial, the district court[1] dismissed Palmisano's ERISA claim and denied his motion to reopen the state court's summary judgment rulings. Palmisano appeals the state court's grant of summary judgment on his defamation claim and the district court's dismissal of his ERISA claim. We affirm.

## I. The Defamation Claim

Allina is a nonprofit health care corporation. At the time in question, Palmisano had some responsibility for financial management of MPI. An Allina staff attorney conducted the internal investigation and completed his final report on the day Palmisano was forced to resign. Anticipating media inquiries, Allina prepared a public statement explaining that it had conducted an investigation into MPI billing practices, that the results had been turned over to federal prosecutors, and that Allina had taken steps to prevent future problems. General Counsel Mark Mishek then met with reporters who had learned of Palmisano's termination from other sources. Mishek departed from the prepared statement by identifying Palmisano by name and position and describing the action taken against him. Mishek also noted that "a substantial sum" was involved, adding that "federal criminal charges are possible." The story received substantial coverage by a local television station and several local newspapers. Each identified Palmisano as having been terminated and mentioned that the federal government was investigating possible Medicare and Medicaid billing fraud at Allina.

---

[1]The HONORABLE FRANKLIN L. NOEL, Chief United States Magistrate Judge for the District of Minnesota, to whom the case was referred by consent of the parties under 28 U.S.C. § 636(c).

In granting summary judgment dismissing Palmisano's defamation claim, the state court concluded that Allina's public statements were reasonably susceptible of a defamatory meaning -- Palmisano was involved in billing fraud -- but were protected by a qualified privilege. After removal, such state court orders remain in effect but "federal rather than state law governs the future course of proceedings." Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 437 (1974). The district court entered final judgment based upon the state court's ruling, declining Palmisano's invitation to revisit the summary judgment issue. On appeal, we review the grant of summary judgment *de novo* to determine whether there are genuine issues of material fact precluding summary judgment. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). We apply federal summary judgment standards, though Minnesota's are virtually identical. See Minn. R. Civ. P. 56.03.

Minnesota law recognizes a qualified privilege protecting an employer against liability for a defamatory statement made about an employee. To qualify, the statement must be made on a proper occasion and for a proper purpose, and be based upon reasonable or probable grounds for believing in its validity, even if it later proves to be false. These are questions of law for the court. See Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 889-90 (Minn. 1986).[2] If the employer proves that it is entitled to this privilege, the employee may still prevail if he proves that the employer abused the privilege by acting with actual malice. See Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 257-58 (Minn. 1980).

---

[2]More recent Minnesota cases have modified this standard by declaring that the issue of whether the employer had reasonable or probable cause to make the allegedly defamatory statement becomes a question of fact for the jury if the evidence "permits of more than one conclusion." Keenan v. Computer Assoc. Int'l, Inc., 13 F.3d 1266, 1271 (8th Cir. 1994). The trial court correctly stated the modified standard and then concluded that here "there can be but one conclusion" on this issue.

Palmisano first argues that the qualified privilege does not extend to a private employer's statements to the media about an employee or a former employee. But he cites no case drawing this distinction, and the Supreme Court of Minnesota has not limited the qualified privilege to particular types of communications or audiences.[3] The privilege turns on whether an employer's statements are made on a proper occasion and for a legitimate purpose. The fact that statements were made to the media will of course be relevant to that inquiry, but we agree with the trial court that such statements may be entitled to the qualified privilege. Here, for example, the MPI billing improprieties included overbilling patients for psychological testing services, potentially in violation of Medicare-Medicaid billing rules. The state court concluded that Allina responded to media inquiries on a subject of obvious public interest, and that Allina had a proper occasion and purpose to speak out because:

> Medicare/Medicaid payments constitute a significant percentage of Allina's gross revenues. . . . Allina's thousands of employees and hundreds of thousands of enrollees had an important interest in being accurately informed as to the status of a federal investigation that could place Allina's Medicare/Medicaid revenues at risk.

The summary judgment record fully supports these conclusions.

Palmisano next argues there are genuine issues of material fact as to whether Allina's public statements were based on reasonable or probable cause. The Supreme Court of Minnesota has only decided this issue as a matter of law in cases where the employer investigated before making the allegedly defamatory statement and "the results of the investigations provided sufficient evidence of probable cause." Wirig v.

---

[3]Like the trial court, we note that courts in other jurisdictions that recognize the qualified privilege have applied it to an employer's statements to the media. See Merlo v. United Way of America, 43 F.3d 96, 104-05 (4th Cir. 1994) (Florida and Virginia law); Richmond v. Southwire Co., 980 F.2d 518, 520 (8th Cir. 1992) (Arkansas law).

-4-

Kinney Shoe Corp., 461 N.W.2d 374, 380 (Minn. 1990). Here, in concluding that Allina had reasonable grounds to believe its statements about Palmisano were accurate, the state court noted that during a "three month internal investigation over two dozen Allina employees were interviewed and the billing records and production reports for [several MPI providers] were analyzed." The staff attorney's written report concluded that Palmisano inadequately responded to allegations of improper billing. Palmisano argues that Allina lacked reasonable cause because the investigator had a motive to find a "scapegoat" such as Palmisano to avoid being blamed himself for not discovering the billing improprieties. But this contention was not made to the state court and is pure speculation. It is undisputed that Allina conducted a thorough investigation and then made statements to the press that were supported by the results of that investigation. On this summary judgment record, the trial court properly concluded that Allina had reasonable or probable cause as a matter of law.

Because Allina is entitled to the qualified privilege as a matter of law, the burden shifts to Palmisano to prove that Allina abused the privilege by acting out of actual malice. To demonstrate malice, he must show the statement was made from "ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." McKenzie v. William J. Burns Int'l Detective Agency Inc., 183 N.W. 516, 517 (Minn. 1921). Actual malice is a jury question. See Frankson v. Design Space Int'l, 394 N.W.2d 140, 144 (Minn. 1986). Palmisano argues the state court erred in granting summary judgment because he presented sufficient evidence that Allina acted "causelessly and wantonly for the purpose of injuring," namely, evidence that Mishek unnecessarily deviated from his prepared public statement and provided Palmisano's name and title to the press, thereby linking him to a possible federal criminal investigation.

The state court noted that the press had already identified Palmisano, and that Mishek in talking with reporters accurately described Palmisano's position and the action taken against him. "Under the circumstances," the court concluded, "the []

methods of dissemination were not excessive. Indeed, necessity dictated that these or similar methods be used -- first to adequately respond to repeated media inquiries and then again to respond to the inflammatory media reports and articles." After a thorough review of the record, we agree with the state court's conclusions and accordingly hold that summary judgment was properly granted dismissing Palmisano's defamation claim.

## II. The ERISA Severance Claim

In March 1994, when Palmisano was working for an Allina predecessor named HealthSpan Health Systems Corporation, HealthSpan provided him a personalized copy of its Executive Benefit Plan Book (the "Plan Book"), a looseleaf compilation describing HealthSpan's various employee benefit plans and programs. The "Other Benefits" section of the Plan Book included a single page entitled "Other Executive Benefits" which contained the following entry:

### EXECUTIVE BENEFITS

### Severance

**Amount of benefit**. In the event of involuntary termination without cause, you will continue to receive your salary and Executive Benefits for a period of 18 months.

See the enclosed description for further details.

**Tax status.** The value of these benefits is added to your W-2 as taxable income.

The Plan Book's Glossary stated: "Executive benefits are provided only to a select group of executives and do not allow for individual choice." It is undisputed that this section of the Plan Book is the only information Palmisano received from Allina and its predecessors about severance benefits.

The "Appendix" section of the Plan Book included a recital that, "As with any plan summary, the legal documents governing the plan will prevail if there are any inconsistencies or inaccuracies in this material." At the time Palmisano received the Plan Book, HealthSpan had adopted two formal severance plans, AHS100, an "Executive Employee Severance Pay Plan," and AHS 200, a "Management Employee Severance Pay Plan." These were welfare benefit plans governed by ERISA. See 29 U.S.C. § 1002(1). They provided twelve and eighteen months of severance pay to an eligible participant, defined as an employee "terminated by the Employer because his or her position has been eliminated." On its face, this eligibility provision is more restrictive than the above-quoted executive severance benefit, which required only that the employee be "involuntarily terminat[ed] without cause."

When terminated, Palmisano requested a severance benefit. Allina responded that he was ineligible. His ERISA claim is premised upon alternative theories: (1) the above-quoted portion of the Plan Book was a faulty ERISA summary plan description that trumps the inconsistent eligibility provisions in the formal plan documents; or (2) in any event, Palmisano's position was eliminated so he is eligible for the severance benefit under the formal Allina/HealthSpan plans. Accepting Palmisano's contention that the Plan Book was a faulty summary plan description,[4] and the advisory jury's finding that Palmisano was terminated without cause, the district court concluded that

---

[4]The reader may wonder why Palmisano did not argue that the Plan Book's severance benefit was an additional "Executive Benefit" separate and apart from the formal ERISA severance plans. The issue was not addressed on appeal, nor apparently at trial. The answer may be that the cryptic Plan Book benefit, standing alone, would not be an ERISA plan, see generally Tischmann v. ITT/Sheraton Corp., 145 F.3d 561 (2d Cir.), cert. denied, 119 S.Ct. 406 (1998), and the state court ruled, prior to removal, that the Plan Book did not give rise to an enforceable contract under state law. In any event, neither party questions the district court's conclusion that the above-quoted Plan Book entry was a botched attempt to describe the formal HealthSpan severance plans.

the terms of the formal plans nonetheless control his eligibility for a severance benefit because Palmisano did not rely on the contrary Plan Book description. The court found that Palmisano was ineligible under the formal plans because his position had not been eliminated and dismissed his ERISA claim. Because the district court conducted *de novo* review of Allina's denial of benefits, we review its findings of fact for clear error. See Donatelli v. Home Ins. Co., 992 F.2d 763, 765 & n.2 (8th Cir. 1993).

On appeal, Palmisano first argues he is entitled to a severance benefit under the terms of the faulty summary plan description in the Plan Book, relying on the statement in Marolt v. Alliant Techsystems, Inc., 146 F.3d 617, 621 (8th Cir. 1998), that "[w]hen summary plan description provisions conflict with formal plan provisions, the summary plan provisions prevail as a matter of law." But our decision in Marolt was expressly limited to cases in which the claimant does not allege that the summary plan description is faulty. By contrast, we explained, "to secure relief on the basis of a faulty summary plan description, the claimant must show some significant reliance on, or possible prejudice flowing from the summary." Marolt, 146 F.3d at 621, quoting Maxa v. John Alden Life Ins. Co., 972 F.2d 980, 984 (8th Cir. 1992), cert. denied, 506 U.S. 1080 (1993); accord Dodson v. Woodmen of the World Life Ins. Soc'y, 109 F.3d 436, 439 (8th Cir. 1997); Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1520 (8th Cir. 1988), cert. denied, 489 U.S. 1051 (1989). Palmisano contended the Plan Book's description was a faulty summary plan description (SPD); therefore, the district court required a showing of reliance. Palmisano urges us to abandon this distinction as irrational because it treats employers who write faulty SPDs more leniently than those who comply with the SPD requirements of ERISA. Of course, as a panel we may not overrule these prior panel decisions. In addition, on the facts of this case, Palmisano's contention is unpersuasive.

The SPD is an important part of ERISA's reporting and disclosure requirements. It is a plain language summary of the plan's terms and benefits that must be distributed to participants. See 29 U.S.C. § 1022(a); 29 C.F.R. § 2520.102-2. ERISA and the

accompanying Department of Labor regulations set forth in great detail the information an SPD must contain and how it must be written. SPDs must be "sufficiently accurate and comprehensive to reasonably apprise [] participants and beneficiaries of their rights and obligations under the plan" and must contain specific information, including:

- the name and type of the plan;
- the name and address of the agent for service of process;
- the name and address of the plan administrator;
- the plan's eligibility requirements;
- circumstances which may result in denial or loss of benefits;
- the source of the plan's financing;
- the plan year; and
- claims procedures and remedies available for redress of denied claims.

See 29 U.S.C. § 1022(a), (b). The regulations add several other mandatory requirements. See 29 C.F.R. §§ 2520.102-2, 102-3.

The Plan Book's severance summary was hopelessly inadequate as an SPD for HealthSpan's two formal severance benefit plans. It contained only one piece of information required by ERISA, a *mistaken* description of the plans' eligibility requirements. The Plan Book directed Palmisano to an "enclosed description," a document which he never received and which neither party introduced into evidence. The summary provided was so thoroughly lacking in the required detail that it cannot be deemed even a faulty SPD. See Pisciotta v. Teledyne Indus., Inc., 91 F.3d 1326, 1329-30 (9th Cir. 1996) (booklets lacking ten of twelve statutory elements did not constitute SPDs). As the Fifth Circuit stated in Hicks v. Fleming Cos., Inc., 961 F.2d 537, 542 (5th Cir. 1992), "If a document is to be afforded the legal effects of an SPD, such as conferring benefits when it is at variance with the plan itself, that document should be sufficient to constitute an SPD for filing and qualification purposes."

If the Plan Book summary was not an SPD, faulty or otherwise, it is easy to determine its effect on Palmisano's ERISA claim. ERISA requires that employee

benefit plans "be established and maintained pursuant to a written instrument," and "provide a procedure for amending such plan." 29 U.S.C. §§ 1102(a)(1), (b)(3). The Plan Book summary may not be construed as controlling or modifying the eligibility requirements in the formal plans because "ERISA precludes oral or informal amendments to a plan, by estoppel or otherwise." Houghton v. SIPCO, Inc., 38 F.3d 953, 958 (8th Cir. 1994). Therefore, regardless of whether Palmisano relied upon the conflicting Plan Book definition of eligibility, the district court correctly concluded that the terms of the formal severance plans are controlling. While Allina (or more precisely, HealthSpan) violated ERISA by failing to provide an SPD describing its severance benefit plans, see 29 U.S.C. § 1024(b), an ERISA disclosure violation does not entitle a participant or beneficiary to benefits to which he is not entitled under the plan. See Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1170 (3d Cir. 1990). Palmisano did not assert a separate claim for a disclosure violation. See 29 U.S.C. § 1132(a)(1)(A), (c).

Palmisano further argues that he qualifies for severance benefits under the terms of the formal severance plans because, after he was fired, his position was eliminated. However, regardless of how Allina may have restructured Palmisano's position after he was terminated, the trial record makes clear that Allina fired him because he had not responded adequately to allegations of billing fraud. Thus, the district court's finding that he was ineligible for benefits under the formal severance plans is not clearly erroneous.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.