# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No.  99-3482

_____

| | | |
|---|---|---|
| Mary McClure and Gary Kemp, | * | |
| | * | |
| Plaintiffs/Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| American Family Mutual Insurance | * | Appeal from the United States |
| Company, American Standard | * | District Court for the |
| Insurance Company of Wisconsin, | * | District of Minnesota. |
| American Family Life Insurance | * | |
| Company, David Krueger,  Daniel | * | |
| DeSalvo, Harvey Pierce, and Dale | * | |
| Mathwich, | * | |
| | * | |
| Defendants/Appellees. | * | |
| | * | |
| | * | |

_____

Submitted: June 14, 2000
Filed:  August 21, 2000

_____

Before MURPHY, HEANEY, and MAGILL, Circuit Judges.

_____

MURPHY,  Circuit Judge.

This case grows out of the termination of Mary McClure and Gary Kemp as agents for American Family Mutual Insurance Company after they lobbied for insurance legislation which the company opposed.  McClure and Kemp sued American

Family, related companies, and company officers for breach of contract, defamation, and other torts. The district court[1] granted summary judgment to the defendants on all claims except for McClure's breach of contract claim which was tried to a jury. That trial resulted in a defense verdict, and judgments were entered in favor of the defendants. McClure and Kemp appeal, and we affirm.

I.

Defendants American Family Mutual Insurance Company, American Standard Insurance Company of Wisconsin, and the American Family Life Insurance Company (together, American Family) are affiliated Wisconsin corporations operating under common management. David Krueger, Daniel DeSalvo, Harvey Pierce, and Dale Mathwich are officers of American Family. American Family is licensed to sell insurance in Minnesota, and it sells a full line of insurance products, including property, casualty, life, auto, and commercial insurance. American Family markets its insurance through exclusive agents whose relationships with it are governed by written contracts which state that they supersede all prior agreements.[2] Its exclusive agents are required to sell all types of insurance offered by American Family.

McClure and Kemp were both exclusive agents under contract with American Family. Kemp first entered into an agency agreement with American Family in 1967 and McClure in 1986. Both agents sold the full line of American Family insurance

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

[2]Kemp's contract provided as follows: "This agreement supersedes all prior agency agreements between Agent or Agent's President individually and the Company, whether written or oral, and constitutes the entire agreement. Except as provided in this agreement, no modification of its terms may be made unless that modification is agreed to in writing by the Agent and the Company." Appellants' App., 117. McClure's contract contained a nearly identical provision. See id. at 127.

products and were prohibited by contract from selling the products of any other insurance company. See Appellants' App., 110, 121. McClure worked out of Mankato and Kemp out of West St. Paul, Minnesota. Between them they had approximately 2600 clients.

The contracts that defined agents' relationship with American Family had identical provisions regarding termination. Under the agreements both the agent and American Family had the right to terminate without cause:

> h. 1) Except as provided in paragraph 2) below, this agreement may be terminated by either [American Family] or the Agent with or without cause by giving written notice to the other and shall be deemed terminated as of the date specified in that notice . . . .

Appellants' App., 113, 123-24. A six month notice period would be required for termination for cause after the agreements had been in effect for two years, however:

> [h.]2) After two years from the Effective Date of this agreement, [American Family] will give the Agent notice in writing of any undesirable performance which could cause termination of this agreement if not corrected. [American Family] will not terminate this agreement for those reasons for a period of six months after that written notice . . . .

Id. at 113; see also id. at 123-24. American Family retained the right to terminate without notice under certain circumstances, however.

Section h.2 also had other language similar to some of the wording in the termination letters from American Family to the agents. It provided: "In no case shall notice of undesirable performance be required prior to termination if the performance in question involves a violation of Sec. 4.i or any other dishonest, disloyal or unlawful conduct[.]" Id. Section 4.i required agents under contract with American Family

-3-

[t]o maintain a good reputation in the Agent's community and to direct Agent's efforts toward advancing the interests and business of [American Family] to the best of Agent's ability, to refrain from any practices competitive with or prejudicial to [American Family] and to abide by and comply with all applicable insurance laws and regulations.

Id. at 111; see also id. at 122.

Both Kemp and McClure were active in the American Family Agents Association, a group organized by agents but never formally recognized by the company. Kemp was the president of the National Association, and McClure was a board member of the Minnesota Association and chair of the National Association Legislative Committee. The Association was involved in legislative lobbying, and in 1995 it lobbied for a bill in the Minnesota legislature to prevent insurance companies from requiring agents to sell a certain number or a certain dollar amount of life or health insurance policies in order to be able to sell property and casualty insurance. The agents preferred to sell property and casualty insurance policies because they were more profitable. The legislation they supported, known as the quota bill, applied only to independent agents as originally introduced. Independent agents are those insurance agents not bound to exclusive contracts.

An amendment was introduced to extend the scope of the bill to include exclusive agents, and American Family opposed it and made its opposition known to its agents. In an email sent to Gary Kemp in March 1995, the company stated that "American Family opposes the application of [the quota bill] to exclusive agents and employee agents . . . . American Family is opposed to this legislative effort to interfere with the contractual rights and obligations of the insurance companies and agents under exclusive agents contracts." Appellants' App., 148 (emphasis removed).

Kemp and McClure nonetheless retained lobbyist Dominic Sposeto on behalf of the Agents Association to encourage the legislature to expand the scope of the quota

bill to include exclusive agents and such a bill was passed during the 1996 session. Sposeto met with lobbyists for American Family in December 1995 to discuss the bill, and one of those lobbyists, Vicky Rizzolo, reported on this in a memorandum delivered in January 1996 to David Krueger, American Family's Northwest Regional Vice-President. The memo indicated that McClure and Kemp had retained Sposeto. Krueger discussed the matter with American Family's Minnesota State Director, Gary Hammer, and they decided that Kemp and McClure had violated their contracts by lobbying for legislation that American Family had opposed. They decided that termination was appropriate. Termination letters were delivered to McClure and Kemp on January 11, 1996, informing them that their contracts with American Family were "being terminated immediately for conduct prejudicial to the company." Section 4.i of the agent contracts required them "to refrain from any practice competitive with or prejudicial" to the company.

The terminations were reported in the press, and American Family made statements about them to the former customers of McClure and Kemp, to American Family agents, and to the public. In a January 1996 letter to the former customers of McClure and Kemp, American Family stated that these agents were no longer selling insurance for the company. American Family also distributed an email to its agents in February 1996 that read in part, "[McClure and Kemp] retained a lobbyist to introduce legislation that would severely restrict American Family's ability to market certain types of insurance products . . . . The efforts of the two agents involved in this legislative activity were in direct violation of the agreements they made in the contracts, and directly against the best interests of the insurance buying public." Appellants' App., 145. American Family made similar statements in a letter to the editor printed in the *Mankato Free Press*.

McClure and Kemp filed a complaint with the Minnesota Department of Commerce in January 1996, asserting that their terminations had violated Minnesota statutes. American Family issued a press release in August 1996, which was also sent

to American Family agents via email, responding to the complaint and the Department's subsequent investigation. It stated that McClure and Kemp had engaged in "disruptive and disloyal activity over a period of years" and that their conduct was "totally unacceptable by any business standard." Appellants' App., 147. An administrative law judge found that American Family had terminated McClure and Kemp as a result of their lobbying and in order to intimidate other agents, but he concluded that the only statute the company had violated was one which required notice at termination about the right to a hearing before a review board. See MINN. STAT. § 60A.177, subd. 2 (1998).

McClure and Kemp then brought this action in state court against American Family, alleging defamation, wrongful termination in violation of public policy, tortious interference with contract, intentional interference with prospective contractual relations, violations of the Minnesota Deceptive Trade Practices Act, misrepresentation, and breach of contract. American Family removed the case to federal court and moved for summary judgment. The plaintiffs resisted the motion, but they chose not to defend their misrepresentation claims. The district court granted summary judgment on all claims except McClure's contract claim, which was tried to a jury.

In granting summary judgment, the district court found that American Family's statements were not defamatory and that the statements were also protected by qualified privilege because they had been made on a proper occasion, in the context of public debate over the terminations, and without malice. The district court rejected the claims of termination in violation of public policy, noting that plaintiffs had not been protected under the relevant Minnesota statute at the time of their terminations. It dismissed claims of tortious interference with contract because plaintiffs had submitted no evidence that defendants had terminated their contracts out of malice or bad faith. Claims of interference with prospective contractual relations were dismissed on the ground that plaintiffs failed to identify any specific contractual relationship that had

been affected. The court rejected the claims under the Minnesota Deceptive Trade Practices Act because plaintiffs had not shown that their ability to provide insurance had been disparaged or that defendants' statements were false. It granted summary judgment on Kemp's breach of contract claim because his contract had an effective date that was only ten days before his termination, and prior notice would not have been required until two years after the effective date.

The court denied American Family's motion for summary judgment on McClure's breach of contract claim because of issues of fact concerning whether her conduct had been "disloyal" or "prejudicial to the company". At McClure's trial one issue was whether her activity related to hiring a lobbyist to work on the expanded quota bill fell within these contract terms. Neither party asked for an instruction on contractual ambiguity. During deliberations the jury asked, "Can an individual … be held to provisions of a contract that would be regarded as unclear to any reasonable person[?]" Appellants' Add., 83. McClure then sought to have the court instruct the jury that an ambiguous contract term should be construed against the drafter. The court declined to introduce a new instruction and referred the jury to the instructions already given. Id. at 89. After the jury returned a verdict in favor of American Family, McClure moved for a new trial based on the court's failure to give the additional instruction. The motion was denied, and this appeal followed.

On appeal, McClure and Kemp argue that the district court erred in granting summary judgment on their claims of defamation, interference with prospective contractual relations, termination in violation of public policy, and Kemp's contract. They have, however, not appealed the dismissal of their claims of tortious interference with contractual relations. Appellants argue that American Family's statements were defamatory because they contained false statements of fact and that the statements were not privileged because they were made with actual malice and without reasonable cause. Because the statements were demonstrably false and disparaged their ability to provide insurance, appellants argue that they are actionable under the Minnesota

Deceptive Trade Practices Act. They also argue that the court erred in dismissing their claims for interference with prospective contractual relations for failure to identify specific relations that were harmed. Kemp says that in dismissing his contract claim the district court relied on a point not advanced by American Family (that he could be terminated without cause because the termination was within two years of the effective date of the contract) and overlooked evidence that the provision on which it relied did not apply to him. McClure asserts that she should receive a new trial because of the court's failure to give an additional instruction to the jury.

American Family argues that the district court properly dismissed the claims on summary judgment and did not abuse its discretion in declining to give an additional instruction. American Family asserts that its challenged statements were only opinion and that they were protected by a qualified privilege, that summary judgment was appropriate for claims under the Minnesota Deceptive Trade Practices Act because its statements were not false and because they did not refer to appellants' business, goods, or services. It argues that the district court properly dismissed appellants' claim for interference with prospective contractual relations because they had failed to identify any specific customer lost because of its statements. It further asserts that it did not violate any significant and well-recognized public policy in terminating appellants, that Kemp had sufficient notice of the basis for dismissing his contract claim, and that his contract permitted termination without notice. Finally, American Family asserts that the district court did not abuse its discretion in not giving an additional instruction in McClure's trial and that such an instruction would have unfairly benefitted her by injecting a new factor into the case when there would no longer have been an opportunity to counter it.

II.

We review a grant of summary judgment de novo, using the same standard as the

district court.  See Lynn v. Deaconess Med. Ctr.-West Campus, 160 F.3d 484, 486 (8th Cir. 1998).  "Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Id. (citation omitted); see FED. R. CIV. P. 56(c).   It is not disputed that Minnesota substantive law governs the tort claims and that Wisconsin law applies to the contract claims by a choice of law provision.

A.

McClure and Kemp argue that the statements American Family made to their former clients and to the public defamed them, violated the Minnesota Deceptive Trade Practices Act (MDTPA), MINN. STAT. § 325D.44, subd. 1 (1998),  and interfered with their prospective contractual relations with former clients.  We address each of these claims in turn.

One issue is whether the statements made by American Family are false as that term is used in defamation.  "For a statement to be defamatory, it must be false, it must be communicated to another, and it must tend to harm the plaintiff's reputation."  Bol v. Cole, 561 N.W.2d 143, 146 (Minn. 1997).  It is well-recognized in Minnesota  that the First Amendment absolutely protects opinion that lacks "a provably false statement of fact."  Hunter v. Hartman, 545 N.W.2d 699, 706 (Minn. Ct. App. 1996).  "Whether a statement can be interpreted as stating facts or can be proven false is a question of law."  Geraci v. Eckankar, 526 N.W.2d 391, 397 (Min. Ct. App. 1995).  In addressing this question, Minnesota courts consider the four factors identified in Janklow v. Newsweek, Inc., 788 F.2d 1300, 1302-03 (8th Cir. 1986): "(1) specificity and precision [of the statement]; (2) verifiability; (3) literary and social context in which it was made, and (4) public context."  Geraci, 526 N.W.2d at 397.

None of the challenged communications made by American Family contains a

provably false statement of fact. These communications, to the effect that appellants had engaged in "disloyal and disruptive activity" and "conduct unacceptable by any business standard", that they did not understand the "value of loyalty and keeping promises," were "acting against the best interests of the insurance buying public," "were falsely claiming they initiated the legislation because they were fighting sales 'quotas'", and "were in direct violation of their agreements", were the company's characterizations of activity that McClure and Kemp had undertaken in connection with the Association's lobbying efforts.

Such statements by American Family are not sufficiently precise or verifiable to support a claim of defamation:

> A commentator who advocates one of several feasible interpretations of some event is not liable in defamation simply because other interpretations exist. Consequently, remarks on a subject lending itself to multiple interpretations cannot be the basis of a successful defamation action because as a matter of law no threshold showing of 'falsity' is possible in such circumstances.

Hunter v. Hartman, 545 N.W.2d 699, 707 (Minn. Ct. App. 1996) (citing Bose Corp. v. Consumers Union, 466 U.S. 485, 512-13 (1984)); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 16-18 (1990). This result is consistent with the holdings of Minnesota courts in similar cases. See, e.g., Geraci, 526 N.W.2d at 397 (statements that plaintiff had "poisoned the board," was "a bad influence," was "emotional" and "not a team player," could not be interpreted as stating facts). One other statement by American Family that plaintiffs claim as defamatory is not actionable because it is true: "You may be receiving a policy with another company from your former agent. You do not have to accept or pay for that policy."

American Family claims its statements were also protected by a qualified privilege. For such a privilege to apply, the allegedly defamatory statements "must be

made in good faith and must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause." Bol v. Cole, 561 N.W.2d 143, 149 (Minn. 1997) (citations and internal quotation marks omitted); see also Palmisano v. Allina Health Sys., Inc., 190 F.3d 881, 885 (8th Cir. 1999). The court determines qualified privilege as a matter of law. See Bol, 561 N.W.2d at 149. The privilege derives from the recognition that statements in some contexts should be encouraged, even if defamatory. See Lewis v. Equitable Life Assurance Soc., 389 N.W.2d 876, 889 (Minn. 1986). "[T]he qualified privilege [is not limited to] particular types of communication or audiences[,]" Palmisano, 190 F.3d at 885, and employers have a right to respond to media inquiries on a subject of clear public interest. See id. at 885-86. The statements made by American Family satisfy the conditions of the qualified privilege. They were made to American Family agents, customers, or the public at large. Each statement was thus made to an audience to which American Family had a legitimate interest in communicating its interpretation of appellants' terminations.

A qualified privilege can be withdrawn if a plaintiff can show that defamatory statements were made with actual malice. See Bol, 561 N.W.2d at 150. This is a question of fact, and is reviewed on summary judgment to determine whether the evidence submitted raises a genuine issue of material fact.[3] See id. Malice is defined as "actual ill-will or a design causelessly and wantonly to injure plaintiff." Id. (internal quotation marks and citation omitted). Malice can be proven either by extrinsic

---

[3]A triable issue of fact may also arise if "the evidence permits of more than one conclusion" concerning whether the assertion was made upon "reasonable and probable grounds." Keenan v. Computer Assoc. Int'l Inc., 13 F.3d 1266, 1270 (8th Cir. 1994) (internal quotation marks and citation omitted). Appellants argue that American Family lacked "reasonable grounds" for making these statements, relying on Wirig v. Kinney Shoe Corp., 461 N.W.2d 374 (Minn. 1990) (defendant lost qualified privilege by accusing plaintiff of theft without sufficient proof). In this case, however, the facts underlying American Family's statements are not in dispute; here the dispute concerns only the form of expression characterizing those facts.

evidence showing personal spite on the part of the person making the statement, or intrinsic evidence, such as "the exaggerated language of the libel, the character of the language used, the mode and extent of publication, and other matters in excess of the privilege." Id. (internal quotation marks and citation omitted). Appellants assert that the findings of the administrative law judge, that American Family fired McClure and Kemp in order to intimidate other agents, is extrinsic evidence of malice and that the language of certain statements shows intrinsic evidence of malice. We conclude, however, that the statements themselves were not so intemperate as to present a genuine issue of material fact as to whether American Family "causelessly or wantonly" attempted to injure plaintiffs' reputations or sufficient to show a motive of actual ill-will.

Appellants assert violation of the Minnesota Deceptive Trade Practices Act (MDTPA) which provides that "A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . (8) disparages the goods, services, or business of another by false or misleading representations of fact [or] (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." MINN. STAT. § 325D.44, subd. 1 (1998). The burden is upon a plaintiff to prove the falsity of the allegedly deceptive statements. See United Wild Rice, Inc., v. Nelson, 313 N.W.2d 628, 635 (Minn. 1982). None of American Family's communications contained a provably false statement so the MDTPA claim must fail. Moreover, the challenged communications do not relate directly to appellants' "business, services, or goods" and so fall outside the scope of the MDTPA.

In this case there is also a claim of tortious interference with prospective contractual relations. To establish such a claim "a plaintiff must prove the defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship." Hunt v. University of Minn., 465 N.W.2d 88, 95 (Minn. Ct. App. 1991) (citing United Wild Rice, Inc v. Nelson, 313 N.W.2d 628, 633 (Minn.

1982)).  Appellants' main evidence of tortious interference is the January 1996 notice American Family sent to their former clients.  The notice said, "You may be receiving a policy from another company from your former agent.  You do not have to accept or pay for that policy.  We hope you will remain an American Family insured as we certainly appreciate your business."  Nothing in this notice defamed or even criticized plaintiffs.  In addition, American Family's communications to the press describing appellants as disloyal and acting against the best interests of the insurance buying public were legitimate expressions of the company's position.  Moreover, appellants failed to offer evidence that any prospective contractual relationship was lost because of any communication.  "[T]he mere general loss of possible unspecified customers does not establish the tort of intentional interference with prospective economic relations under Minnesota law."  International Travel Arrangers v. NWA, Inc., 991 F.2d 1389, 1405 (8th Cir. 1993).

B.

Appellants also alleged that American Family had violated a Minnesota statute limiting the ability of insurance companies to terminate or penalize employees for contacting government agencies.  At the time of their terminations a statute provided that:

> An insurance company may not terminate or otherwise penalize an insurance agent solely because the agent contacted any government department or agency regarding a problem that the agent or an insured may be having with an insurance company.

MINN. STAT. § 72A.20, subd. 20 (1994).  Following the terminations of McClure and Kemp but before this lawsuit was filed, the Minnesota legislature modified the statute

-13-

specifically to include contact with the state legislature.[4] The administrative law judge concluded that American Family had terminated McClure and Kemp because of their lobbying activities, but he also concluded that American Family had not violated the statute because at the time it applied only to contact with executive departments. Appellants' contacts with the legislative branch were therefore not covered, and the amended statute could not be applied retroactively. Appellants' App., 84. Appellants do not dispute these conclusions. Rather, they assert that the amended statute articulates a public policy of the state that employees should not be retaliated against for petitioning the legislature and that the court should craft a common law remedy in order to enforce that policy for the period prior to the passage of the statute.

While Minnesota courts have had occasion to create judicial remedies for employment actions taken in violation of public policy,[5] we find that the circumstances required for the creation of such a remedy are not present in this case. Courts have authorized judicial remedies based on public policy only when statutory remedies were lacking. See Novosel v. Nationwide Ins. Co., 721 F.2d 894, 898-99 (3d Cir. 1983); Phipps v. Clark Oil & Ref. Corp., 408 N.W.2d 569, 571 (Minn. 1987). Both before and after its amendment, MINN. STAT. § 72A.20, subd. 20, provided a remedy that

---

[4]"For purposes of this section, 'government department or agency' includes the executive, legislative, and judicial branches of government as stated in article III of the Constitution." MINN. STAT. § 72A.20, subd. 20 (1998).

[5]The Minnesota Court of Appeals recognized a public policy exception to the doctrine of at will employment in Phipps v. Clark Oil & Refining Corp., 396 N.W.2d 588 (Minn. Ct. App. 1986), later codified at MINN. STAT. § 181.932, subd. 1 (1998), and the Minnesota Supreme Court ratified the court's decision to allow a wrongful discharge action before the subsequent passage of the statute. See Phipps v. Clark Oil & Ref. Corp., 408 N.W.2d 569, 571 (Minn. 1987). Following Phipps, this court interpreted the public policy exception to include wrongful wage discrimination as well as wrongful discharge. See Piekarski v. Home Owners Sav. Bank, F.S.B., 956 F.2d 1484, 1493 (8th Cir. 1992).

completely effected its stated purpose. "Once the Minnesota legislature has drawn the line between employment disputes that genuinely implicate public policy and are actionable and those that are not, it is not for courts to redraw that line." Piekarski v. Home Owners Sav. Bank, F.S.B., 956 F.2d 1484, 1493 (8th Cir. 1992). Minnesota courts have consistently declined to create causes of action that duplicate statutory claims. See Thompson v. Campbell, 845 F. Supp. 665, 676 & n.11 (D.Minn. 1994); Steinbach v. Northwestern Nat'l Life Ins. Co., 728 F. Supp. 1389, 1394 (D. Minn. 1989); see also Blanchard v. Northwest Publications, Inc., 2000 WL 54354 at * 3 (Minn. Ct. App. January 25, 2000) (unpublished opinion). Similar considerations weigh against the creation of retroactive judicial remedies that mirror non-retroactive statutory remedies.

C.

The contracts of McClure and Kemp had substantially identical provisions regarding termination without notice. Each stated that the contract could be terminated by either party without notice within two years from its effective date. Kemp's contract stated that its effective date was January 1, 1996, only ten days before American Family terminated him, while McClure's contract had an effective date of January 1, 1993. This difference caused the district court to treat appellants differently on the motion for summary judgment. On appeal, Kemp argues that the district court based its decision on a theory not advanced by American Family and that he could have shown that section h.2 of the contract was intended to apply to him.

A court has inherent power to grant dispositive motions sua sponte "so long as the losing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) (citation omitted). "[A] grant of summary judgment is proper only where the party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be entered. . . . [T]he propriety of

-15-

granting summary judgment *sua sponte* turns on proper notice to the nonmoving party and an opportunity to respond." Madewell v. Downs, 68 F.3d 1030, 1048-49 (8th Cir. 1995) (internal quotation marks and citations omitted).

In its motion for summary judgment, American Family argued that "American Family did not breach the contracts because the contracts permit termination with or without cause by giving written notice . . . . Because the contracts at issue were at-will contracts, the terminations were not in breach of the contracts." Appellants' App., 233. In a footnote American Family argued in the alternative that appellants could have been terminated without notice because they had engaged in practices prejudicial to the company. In their brief opposing summary judgment, McClure and Kemp acknowledged that American Family had asserted they had at-will contracts which had not been breached, but they argued that the contracts were not at-will and cited to contract language relating to the two year period after the effective date:

> By their terms, these are not at-will contracts. Section 6(h)(2) states that two years after the effective date, American Family 'will give you notice in writing of any undesirable performance which could cause termination of this Agreement if not corrected.' Plaintiffs' contracts were in effect for over two years, thus requiring written notice.

Appellants' App., 245-46. In their reply brief appellants argued that because their contracts had been in effect for more than two years, written notice was required before their terminations. Kemp's assertion is thus without merit that he was "ambushed" with the theory that prior notice was not required. See Berg v. Norand Corp., 169 F.3d 1140, 1144 n.4 (8th Cir. 1999). The effective date of Kemp's contract was January 1, 1996, and he was terminated on January 11, 1996. The plain terms of the contract therefore permitted American Family to terminate him on the date it did.

Kemp further asserts that the company had assured him that he would have the benefit of a six month notice provision because of his long service. He argues that

evidence of this promise is admissible despite the parol evidence rule to demonstrate that his 1996 contract did not embody the totality of the agreement and to clarify a latent ambiguity. Under the Wisconsin parol evidence rule, the extrinsic evidence that Kemp sought to introduce of prior agreements and the discussion concerning the 1996 contract could not alter the terms of the written contract. "When the parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress, or mutual mistake." In re Spring Valley Meats, Inc., 288 N.W.2d 852, 855 (Wisc. 1980) (internal quotation marks and citation omitted). The merger clause in the 1996 contract states that it constitutes the "entire agreement" between the parties[6] and bars consideration of extrinsic evidence on that issue. See id. The provisions in Kemp's contract relating to termination are unambiguous and parol evidence could not be considered in interpreting them. See American Mut. Liab. Ins. Co. v. Fisher, 206 N.W.2d 152, 155 (Wisc. 1973). The parol evidence Kemp seeks to submit cannot modify the 1996 agreement. The district court properly granted summary judgment to American Family on this claim.

III.

The district court denied summary judgment on McClure's contract claim, and this claim went to trial. At issue was the question of whether American Family had breached the contract by terminating McClure without six months notice. American Family argued at trial that in her lobbying activities McClure had engaged in "disloyal conduct" and "practices prejudicial" to the company as those terms were defined by the contract; her termination without notice was therefore justified under section 4.i. See Appellee's App., 56-71. McClure argued that the terms "disloyal" and "prejudicial" were ambiguous as stated in the contract, but were clarified by extrinsic

_____

[6]See supra at n.2.

evidence offered at trial.  Id. at 98-99.  So clarified, her actions were not "disloyal" or "prejudicial" and therefore her contract was breached by termination without notice. Id. at 112-13.   McClure did not bring up the rule that contractual ambiguities should be interpreted against the drafter nor did she request an instruction to that effect.   Only when the jury raised a question during its deliberations did she request an instruction that an ambiguous term be construed against its drafter.

A trial judge had the duty to provide a jury with further instruction when it appears necessary, see, e.g.,  Swift v. R.H. Macy's & Co., Inc., 780 F.2d 1358 (8th Cir. 1985), but the court need not instruct on an issue that was not earlier addressed by the parties, see id. at 1361, or a defense that was not raised, see United States v. Lewis, 987 F.2d 1349, 1353-54 (8th Cir. 1993).   The reason for this rule is that:

> If a court  … were to accede to a party's request to present an additional … theory to the jury, the court would in effect be, first, allowing the requesting party in the midst of jury deliberations to retailor its trial strategy to meet the perceived concerns of the jury and, second, allowing a new theory to go to the jury without having first afforded the other party an opportunity to address the merit or the lack thereof in the theory.

Fan Fare, Inc., v. Fourdel Indus., Ltd., 563 F. Supp. 754, 759 (M.D.Ala. 1983), *aff'd mem.*, 732 F.2d 943 (11th Cir. 1984).

McClure did not ask before the case was submitted that the jury be instructed that an ambiguous contract term be interpreted against the drafter of the contract.  Had she done so, and had there been evidence and argument on this issue, it might have been an abuse of discretion for the district court not to give it.   Although "[a] fundamental rule of contract construction … is that any ambiguity must be construed most strongly against the drafting party[,]" Capital Inv., Inc. v. Whitehall Packing Co., Inc., 280 N.W.2d 254, 259 (Wisc. 1979) (citation omitted); see also Gorton v. Hostak, Henzl & Bichler, S.C., 577 N.W.2d 617, 623 (Wisc. 1998), that is only one canon of

construction. See Wilke v. First Fed. Sav. and Loan Ass'n of Eau Claire, 323 N.W.2d 179, 181 (Wisc. Ct. App. 1982). We conclude that in the circumstances of this case introducing such an instruction only during deliberations would have been unfair and prejudicial since the opportunity had passed for the admission of argument and evidence against it. The district court did not abuse its discretion by declining to give the additional instruction.

IV.

After a thorough review, we conclude that the district court did not err in granting its summary judgment or abuse its discretion in instructing the jury on McClure's contract claim. The judgments of the district court are affirmed.

HEANEY, Circuit Judge, concurring.

I concur in the result reached by the majority only because the appellants abandoned their claim that the appellees violated Minnesota Statute § 72A.20, subd. 20. In my view, the administrative law judge erred in deciding that the appellees had not violated the statute because the Legislature was not a department or agency of the State of Minnesota. I believe that this ruling is contrary to the Minnesota Constitution. Unfortunately for the appellants, they not only failed to appeal the administrative law judge's decision on that issue, but they also specifically noted both in the district court and here that they were abandoning that claim and instead were appealing on the basis that the statute expressed the public policy of the state. I agree with the majority on the public policy issue; thus, I have no alternative but to concur in the result.

Fortunately, the Minnesota statute has now been amended to clarify the original intent of the Legislature to make clear that the Legislature is included in the purview of the statute. Thus, in the future an insurance company may not terminate an agent's

contract because the agent has either directly or indirectly made contact with the Legislature on matters which directly involve their economic future.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS,  EIGHTH CIRCUIT.