# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

Nos. 06-1046, 06-1047, 06-1141

———————

|  |  |  |
|---|---|---|
| Michelle Antolik, et al., | * | |
| | * | |
| | * | |
| Plaintiffs - Appellees/ | * | |
| Cross-Appellants, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Saks, Incorporated, doing business as | * | |
| Younkers, Inc., | * | |
| | * | |
| Defendant - Appellant/ | * | |
| Cross-Appellee. | * | |

———————

Submitted: June 12, 2006
Filed: September 14, 2006

———————

Before LOKEN, Chief Judge, ARNOLD, Circuit Judge, and DOTY,[*] District Judge.

———————

LOKEN, Chief Judge.

Many salaried employees of Younkers, a department store division of Saks, Incorporated, lost their jobs in October 2002 when Saks consolidated the Younkers division into its Carson Pirie Scott division. Though Saks paid severance benefits,

———————

[*]The HONORABLE DAVID S. DOTY, United States District Judge for the District of Minnesota, sitting by designation.

fifteen former Younkers employees commenced this class action in state court seeking additional severance benefits allegedly promised in an October 27, 2000, letter Saks distributed when it adopted an employee welfare plan entitled the 2000 Change of Control and Material Transaction Severance Plan (the "COC Plan"). Saks removed the case. When the district court ruled that the Employees Retirement Income Security Act ("ERISA") governs the COC Plan and preempts plaintiffs' state law claims, they asserted claims for relief under ERISA, 29 U.S.C. §§ 1001 *et seq*.

The district court certified the class and denied Saks's motion for summary judgment on plaintiffs' claims to recover benefits under the COC Plan and for appropriate equitable relief. See 29 U.S.C. §§ 1132(a)(1)(B), (a)(3). After a bench trial, the court ruled that the letter was a faulty summary plan description (SPD) that contradicted the COC Plan by promising benefits if Saks internally consolidated two operating divisions. Therefore, the court awarded plaintiffs the severance benefits promised in the letter and $301,110 in attorneys' fees and costs. Antolik v. Saks, Inc., 391 F. Supp. 2d 771 (S.D. Iowa 2005). Saks appeals the judgment; plaintiffs cross appeal the court's preemption and set-off rulings. We review the district court's findings of fact for clear error and its legal conclusions *de novo*. Koons v. Aventis Pharm., Inc., 367 F.3d 768, 774 (8th Cir. 2004). We conclude that the letter was neither an SPD nor a free-standing promise of benefits. Accordingly, we reverse.

## I.

Beginning in 1989, Saks grew by acquiring a number of department store enterprises, including Saks Fifth Avenue in the mid-1990's. In July 2000, with weak sales and declining profits from its traditional department store chains such as Younkers, Proffitt's, and Carson Pirie Scott, Saks announced that it would spin off the Saks Fifth Avenue, Saks Direct, and Saks Off Fifth stores to an independent company. This fueled rumors that Saks or its various department store groups were likely acquisition targets for larger competitors. In addition, Saks had recently consolidated

the home office of its Herberger's division into the home office of Carson Pirie Scott in Milwaukee, and the home office of McCrae's into the home office of Proffitt's. The rumors and consolidations particularly concerned salaried employees at the Younkers home office in Des Moines because Younkers was now the smallest independent department store division.

In the fall of 2000, Saks sought to quiet these concerns, raise morale, and energize its salaried work force with a three-part package of incentives: a revised bonus plan offering the promise of fourth quarter bonuses in a slow year; new stock options geared to Saks's depressed share price; and the COC Plan to quell fears of unprotected job losses. The package was explained to affected Younkers employees at an October 27 meeting conducted by Mark Barkley, the vice president of human resources for the Younkers division. To explain the COC Plan, Barkley read an October 27 letter from Saks's CEO to eligible employees. The letter stated:

> The Board of Directors of Saks Incorporated has adopted a change of control severance plan for certain salaried associates. We want to explain the reason for the plan and what it means to you.
>
> The Company (including the individual divisions that comprise it) is not for sale and we do not anticipate any circumstances leading to a change of control. However, some of you have suggested that we have associates who are distracted by the thought of such an event. The Board wants each key associate's full attention on achieving our plans and building a great enterprise. To support this goal and diffuse further concerns, the Board has provided a plan that functions as an associate insurance policy, protecting against an unlikely but worrisome event.
>
> For you personally, were there to be a change of control or sale of a major business unit that caused the elimination of your position, a

reduction in your pay, or a change of your location greater than 50 miles, you would be entitled to 26 weeks of salary.[1]

Building and maintaining focus and commitment is critically important to our success. We are optimistic about the balance of this year and our prospects for 2001 and beyond. Neither the Corporation nor any of its divisions are for sale nor do we expect this to occur. This Company's leadership and its Board of Directors are fully committed to the business and believe that we can and will achieve our plans and create substantial long term value. Thanks for your commitment.

At trial, many plaintiffs testified that they left the meeting believing that the COC Plan would apply to internal consolidations, such as Herberger's and Carson Pirie Scott. Plaintiffs recalled no discussion of that issue at the meeting. On the other hand, Barkley testified that he was asked the question and told the group that the COC Plan would apply only to a change of control of Saks resulting from an external takeover, or to a sale by Saks of one of its major business units. Barkley described the COC Plan's severance benefits as unusually generous. As explained to him by an in-house attorney, the COC Plan was a form of "poison pill" intended by Saks to deter unwanted acquiring companies. But that intent was not disclosed to employees, nor did Saks disseminate any document clarifying that "change of control" under the COC Plan was limited to changes of control of the parent company.

The fourteen-page COC Plan declared that it "is intended to qualify as an unfunded welfare plan under" ERISA. The Plan stated that a participant will be entitled to severance pay and other Plan benefits if, within two years of a change of control, the participant is terminated or relocated more than fifty miles. "Change of control" was defined as the acquisition of voting control or majority ownership of Saks securities, or a shift in the controlling majority of its Board of Directors. In other words, change of control did not include internal consolidations of Saks divisions or

---

[1]The amount for "Director-level associates and Buyers." Higher ranking officers were promised 52, 78, or 104 weeks of salary.

-4-

affiliates. The COC Plan was not distributed to employees at the meeting or at any time thereafter. The district court found that "[i]t was the intent of Saks Inc. not to provide the Class Plaintiffs with" the COC Plan. Antolik, 301 F. Supp. 2d at 777.

Two years later, Saks consolidated the Younkers home office into the Carson Pirie Scott home office. Saks paid severance benefits and "cooperation bonuses" to terminated Younkers' employees, as it had following prior internal consolidations. However, the amounts paid were substantially less than what class members would have received had the COC Plan applied to the consolidation. This lawsuit followed.

The district court held that the class plaintiffs are entitled to recover $1,661,317 in benefits due under the COC Plan. It is undisputed that plaintiffs are due no benefits under the terms of the Plan, which unambiguously provided that "change of control" did not include the internal consolidation of Younkers and Carson Pirie Scott. However, the court concluded that plaintiffs are entitled to recover COC Plan benefits because the October 27, 2000, letter was a faulty SPD that conflicted with the COC Plan by unambiguously promising severance benefits under the Plan to eligible Younkers employees who lost their jobs as a result of this internal consolidation. This legal conclusion regarding the letter's status under ERISA is the crux of these appeals.

## II.

Adequate disclosure of employee benefits is an important ERISA principle. To this end, the statute provides that an ERISA plan administrator (here, Saks) shall furnish a "summary plan description" to plan participants and beneficiaries within 120 days after the plan becomes subject to ERISA. See 29 U.S.C. §§ 1022(a), 1024(b)(1)(B). An SPD "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations

under the plan." 29 U.S.C. § 1022(a). Both the statute and the Secretary of Labor's implementing regulations contain detailed provisions specifying the types of information that must be disclosed in an SPD. See 29 U.S.C. § 1022(b); 29 C.F.R. § 2520.102-2, 102-3.

The district court correctly noted that, "[b]ecause of the importance of disclosure to the statutory regime, an SPD provision prevails if it conflicts with a provision of a plan." Jensen v. SIPCO, Inc., 38 F.3d 945, 952 (8th Cir.1994), cert. denied, 514 U.S. 1050 (1995); see Koons, 367 F.3d at 775. This rule applies even if the SPD is "faulty" -- that is, does not contain all the information required by the statute and regulations -- provided the plan claimant proves reliance on or prejudice from the faulty SPD. See Marolt v. Alliant Techsys., Inc., 146 F.3d 617, 621 (8th Cir. 1998). However, the rule does not apply if the conflicting document on which the claimant relies "was so thoroughly lacking in the required detail that it cannot be deemed even a faulty SPD." Palmisano v. Allina Health Sys., Inc., 190 F.3d 881, 888 (8th Cir. 1999).

The reason that a "hopelessly inadequate" SPD does not trump a conflicting plan provision is rooted in the fundamental principle that "ERISA precludes oral or informal amendments to a plan, by estoppel or otherwise." Jensen, 38 F.3d at 953. If a document is so "hopelessly inadequate" that it cannot even be considered a faulty SPD, the plaintiff may not recover because an ERISA plan cannot be changed by informal amendments, even if employees relied on those amendments. Palmisano, 190 F.3d at 888. We require that a document substantially comply with ERISA's formal requirements because "there should be no accidental or inadvertent SPDs." Hicks v. Fleming Cos., 961 F.2d 537, 542 (5th Cir. 1992). "If a document is to be afforded the legal effects of an SPD, such as conferring benefits when it is at variance with the plan itself, that document should be sufficient to constitute an SPD for filing and qualification purposes." Palmisano, 190 F.3d at 888 (quoting Hicks).

-6-

In this case, Saks initially moved to dismiss on the ground of ERISA preemption. Plaintiffs argued that their state law claims should not be preempted because the COC Plan document was never disclosed. Saks responded that the October 27, 2000, letter was an SPD, a required ERISA disclosure. Though ultimately concluding that the COC Plan is governed by ERISA, the district court rejected Saks's contention, concluding that the letter was a "woefully inadequate" SPD under Palmisano: "The October 27, 2000 letter given to employees here fails as a summary plan description on every point except for an ambiguous reference to the type of plan at issue." Mem. Opinion & Order dated Aug. 13, 2003, at p. 7. However, in denying Saks's subsequent motion for summary judgment, the court did an unexplained about-face, concluding that the letter was a faulty SPD, not a hopelessly inadequate SPD, because it "does not reference any other document and arguably meets six of the eight requirements listed in the *Palmisano* decision." Mem. Opinion & Order dated Aug. 17, 2005, at p. 12. We conclude that the court's initial ruling on this issue was correct -- the letter was not an SPD as a matter of law.[2]

The text of the October 27, 2000, letter gave no hint that it was intended to be an SPD. Its stated purpose was "to explain the reason for the plan and what it means to you." It did not attempt to explain the COC Plan's complex provisions governing (i) events that would terminate a participant's eligibility, (ii) benefits available after various transactions and Saks's payment options, (iii) the COC Plan's claims procedures, and (iv) the remedies available to redress claim denials. See 29 U.S.C. § 1022(b). Significantly, the letter did not contain the statement of participants' rights under ERISA that is mandated by the regulations. See 29 C.F.R. § 2520.102-3(t)(2). This statement would have advised participants of their right to examine the COC Plan and to obtain Plan documents. In summary, the October 27, 2000, letter was an

---

[2]We note that the court's initial ruling was consistent with its decision in Paulson v. Paul Revere Life Ins. Co., 323 F. Supp. 2d 919, 935-36 (S.D. Ia. 2004), that a document not represented to be an SPD and lacking a substantial amount of required information was not an SPD.

informal description of the COC Plan, drafted for business reasons (to improve employee morale), not to satisfy Saks's ERISA duty to furnish Plan participants with an SPD. The district court seemed to place great emphasis on the fact that, if the letter was not deemed an SPD, then Saks breached this ERISA duty. This is undoubtedly true, and Saks warrants no praise in that regard. But it is not a relevant fact because "an ERISA disclosure violation does not entitle a participant or beneficiary to benefits to which he is not entitled under the plan." Palmisano, 190 F.3d at 888-89.

For this reason, we reverse the district court's decision upholding plaintiffs' claims for benefits due under the COC Plan as modified by a conflicting SPD -- the October 27, 2000, letter. Alternatively, we also disagree with the district court's conclusion that the term "change of control" in the letter was so unambiguous as to trump the plain meaning of that term as used in the COC Plan itself. See Jensen, 38 F.3d at 952 (only "clear and unambiguous statements in the summary plan description are binding"). In our view, it was obviously unclear whether the letter meant change of control in the corporate law sense, where the focus is on control of the parent corporation and its securities, or in the employer-employee sense, where a change in supervisors at almost any level of the enterprise might be viewed as a "change of control" by the supervised employees. It appears that Saks purposely deceived its nervous workforce by using this ambiguous term knowing it was likely to be misconstrued by employees, while at the same time ignoring its ERISA duty to furnish an SPD advising that the COC Plan was available for all participants to examine. But there was no actionable misrepresentation and, indeed, no reasonable detrimental reliance by Younkers employees who continued to work without confirming exactly what severance benefits were available under the COC Plan.[3]

---

[3]It appears that Saks's deception was the brainchild of its former senior vice president for human resources, Thomas Coan, who drafted the October 27, 2000, letter and devised the strategy for explaining it to eligible employees. This strikes us as a foolish strategy at best. An intelligent employee who was thinking of leaving Saks unless the COC Plan applied to future internal consolidations would have asked to see

**III.**

Plaintiffs in their cross appeal raise two alternative grounds for relief that we must consider. First, plaintiffs argue that the district court erred when it held their state law claims preempted by ERISA. The letter was not an ERISA plan, they argue, because it was a freestanding promise to pay a one-time, lump-sum severance benefit that did not require "an ongoing administrative program" to determine eligibility for and the amounts of benefits. Eide v. Grey Fox Technical Services Corp., 329 F.3d 600, 605 (8th Cir. 2003), quoting Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 12 (1987). This contention confuses two distinct issues.

(a) The district court carefully reviewed its various eligibility provisions and correctly concluded that *the COC Plan* is an ERISA plan because, to determine eligibility, "the administrator must review the particular circumstances of each individual employee based on the identified eligibility criteria." This conclusion, which plaintiffs do not challenge, established that ERISA preempts all state law claims that "relate to" the COC Plan, 29 U.S.C. § 1144(a), whether or not the October 27, 2000, letter was itself an ERISA plan.

(b) Though the COC Plan was an ERISA plan, plaintiffs' state law claims based on the letter would not be preempted if the benefits promised in the letter "were free-standing and were not premised in any way on the existing plan." Crews v. Gen. Am. Life Ins. Co., 274 F.3d 502, 505 (8th Cir. 2001), followed in Eide, 329 F.3d at 606. But here, the letter was an attempt to explain the severance benefits *provided in the COC Plan*. "An employer's promise that ERISA plan benefits will be paid if a future

---

the Plan. That request must be honored, and the deception would then be exposed. On the other hand, if no one asked to see the Plan, the strategy subjected Saks to class action lawsuits such as this by employees who continued working for other reasons and were terminated after an arguable "change of control."

contingency occurs does not create a 'free-standing contract' within the meaning of Eide." Johnson v. U.S. Bancorp, 387 F.3d 939, 942 (8th Cir. 2004).

Second, without citing relevant authority, plaintiffs urge us to reinstate their claim for equitable relief under 29 U.S.C. § 1132(a)(3) if we reverse the district court's award of benefits under § 1132(a)(1)(B). This contention is without merit. "[W]here a plaintiff is provided adequate relief by the right to bring a claim for benefits under . . . § 1132(a)(1)(B), the plaintiff does not have a cause of action to seek the same remedy under § 1132(a)(3)(B)." Geissal v. Moore Med. Corp., 338 F.3d 926, 933 (8th Cir. 2003) (quotation omitted); see Varity Co. v. Howe, 516 U.S. 489, 515 (1996).

## IV.

Our decision that the plaintiff class members are entitled to no relief on their claims for additional severance pay under either ERISA or state law renders moot their cross appeal of the district court's offset ruling. The district court's award of substantial attorneys' fees must also be reversed because plaintiffs are no longer prevailing parties. However, it is an open issue in this circuit whether attorneys' fees may be awarded under 29 U.S.C. § 1132(g)(1) to an ERISA plan claimant who does not prevail. See Geissal, 338 F.3d at 934-35. Certainly, the amount previously awarded, $301,110, would be excessive. But Saks's deceptive behavior and flagrant disregard of its ERISA disclosure duties may make this the rare case where some modest award is appropriate. That is an issue we leave in the first instance to the district court's discretion. Accordingly, the judgment of the district court is reversed and the case is remanded for entry of judgment on the merits in favor of Saks and for further consideration of the attorneys' fee issue.

_____