Thomas **PAULSON**, Plaintiff,

v.

**THE PAUL REVERE LIFE
INS. CO.,** Defendant.

No. 4:03–CV–90234.

United States District Court,
S.D. Iowa,
Central Division.

June 16, 2004.

R. Ronald Pogge, Thomas P. Murphy, Hopkins & Huebner, Des Moines, IA, for Plaintiff.

Michael W. Thrall, Nyemaster Goode Voigts West Hansell & O'Brien PC, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

PRATT, District Judge.

Plaintiff filed a Complaint in the above-captioned matter on April 30, 2003, alleging that Defendant wrongfully denied him long term disability benefits pursuant to the Employee Retirement Income Security Act ("ERISA"). Currently pending before the Court are Plaintiff's Motion for Summary Judgment (Clerk's No. 13); Defendant's Motion for Summary Judgment (Clerk's No. 23); and Defendant's Motion to Strike (Clerk's No. 33). The parties have filed briefs, resistances, and replies to the motions and have agreed to submit the case on cross motions for summary judgment. *See* Clerk's No. 9. A brief telephone hearing was held on May 12, 2004 and the matter is fully submitted.

## I. FACTUAL BACKGROUND

At the time of the injury Plaintiff claims is the cause of his disability, Plaintiff was working as manager of Embers Restaurant in Des Moines, Iowa. Plaintiff reports that he generally worked approximately eighty hours per week and was frequently required to work twenty-four hour shifts and cover for employees who were absent. On January 1, 1999, Plaintiff slipped and fell while carrying a tub of dishes at Embers. He struck the back of his head on the floor and drove himself to the hospital to have his injury evaluated. Iowa Lutheran Hospital treated Plaintiff at the emergency room. The treating doctor noted that Plaintiff claimed not to have lost consciousness, but had a headache and some pressure behind his eyes. Plaintiff did not experience any dizziness or nausea from the fall and did not have visual disturbances at the time he was seen in the emergency room. Plaintiff did report seeing "bright lights" immediately after the fall, however, he admits that this may have been the result of his position after falling, *i.e.*, lying on his back on the floor looking up toward the ceiling lights. An emergency room physician diagnosed Plaintiff with a "head injury" and discharged him with instructions to take Advil, follow standard head injury precautions, and follow up with his family physician if needed. Joint App. at 87–88.

On February 18, 1999, Plaintiff was called into the restaurant to work. Upset by the call, Plaintiff scratched his own face until it bled. On the way to the restaurant, Plaintiff drove his car into a snowbank. Once at the restaurant, Plaintiff hit the wall with his fist and fractured his fifth right metacarpal. The treatment notes from Iowa Lutheran Hospital reflect that Plaintiff "[was] having a stressful time with his job at this time and tonight he was stressed out about his job situation ...." *Id.* at 85. The treating physician noted that Plaintiff's past medical history was, "Remarkable for a similar episode of explosive temper a few years ago. There

is no prior history of depression, suicidal ideation or suicide attempts." *Id.* Plaintiff's fracture was treated and he was advised to follow up with his family physician, both for his fracture and to get a referral "to a specialist who would help him in controlling his temper." *Id.* at 84. February 18, 1999 was the last day that Plaintiff actually performed work at Embers, though he remained on the payroll, and was thus still formally employed, until March 28, 1999.

On February 22, 1999, Plaintiff sought counseling with Ed Ashby, a licensed mental health counselor. Ashby diagnosed Plaintiff with depression and noted that treatment would consist of cognitive and behavioral therapy. Ashby also recommended that Plaintiff be placed on an antidepressant. Plaintiff's family physician, Dr. Rick Wilkens, M.D., prescribed Prozac for Plaintiff on April 14, 1999 and Ashby and Plaintiff continued their therapy sessions.

Plaintiff began treating with Damini Parulekar, M.D., on July 27, 1999. Plaintiff told Dr. Parulekar that he began using Prozac for depression in mid-April 1999 and responded well until early July. After that point, Plaintiff began noticed that he was overly sleepy during the day and his wife remarked on his slow responses and difficulty with decision making. Plaintiff reported having no drive, feeling sad, irritable, sluggish, worried, guilty, and that he had difficulty concentrating. Dr. Parulekar noted, "Decision-making has been troublesome for a few years, but worse since 1998." Joint App. at 76. In his notes regarding Plaintiff's temper, Dr. Parulekar wrote, "He has had a temper & denies having been violent toward others. S/T he was a calm person which changed 5–6 years ago." *Id.* Stressors in Plaintiff's life were listed as overworking for the last year, especially in the three months prior to January 1999; a daughter born in 1998

with Downs syndrome and accompanying medical problems; health, financial, and family problems. *Id.* at 75. Dr. Parulekar diagnosed Plaintiff with "Major depression, single without psychotic features." *Id.* at 73. He increased Plaintiff's dosage of Prozac and recommended techniques for stress management and continued therapy sessions with Ashby. *Id.*

It appears from this point, Plaintiff continued treatment with Dr. Parulekar and continued one-on-one therapy sessions with Ashby. Plaintiff saw Dr. Parulekar approximately once per month after his initial visit. Dr. Parulekar's progress notes reveal that the severity of Plaintiff's condition waxed and waned over the months. On Attending Physician Statements provided to Defendant, Dr. Parulekar repeatedly indicated that Plaintiff's diagnosis was "Major Depression, Single," and that the prognosis for Plaintiff was fair. Treatments listed were medications and therapy. *See* Joint App. at 145, 150, 288, 288, 294, 310, 313., 328, 334, 340. Ashby's findings regarding Plaintiff were similar. In Attending Physician Statements, Ashby noted that the Plaintiff had been diagnosed with depression and that his "progress toward recovery is good."

On May 7, 1999, Plaintiff signed a claim form seeking Long Term Disability Benefits. Plaintiff checked the boxes indicating that the condition was due to both an accident and a sickness. In response to the question, "Describe the injury incurred (what, how, where, date) or the nature and details of the sickness and when it began," Plaintiff replied, "The sickness is depression and it has been going on for some time." Plaintiff noted his treatment for a concussion on January 1, 1999 and stated that his condition prevented him from, "Planning, organizing, implementations, inspection and controlling. The condition mostly affects planning and organization

and controlling, but it affect implementation and inspection also. I have trouble concentrating and thinking and reacting quickly. The decision making mental processes are slowed down." On May 12, 1999, Plaintiff's family physician, Dr. Rick L. Wilkens, signed an "Attending Physician Statement" identifying Defendant's primary diagnosis as Depression with a secondary diagnosis of "right hand metacarpal fracture." Defendant received these documents on June 1, 1999 and immediately began obtaining documentation in support of Plaintiff's claim.

Defendant approved Plaintiff's disability claim on October 1, 1999 under the "Other Limitations" provision of the policy. According to Defendant's letters of approval, the "Other Limitations provision covers:

> [A]ny disability which is caused or contributed to by a Mental Disorder or Substance Use Disorder, benefits are payable for up to twenty-four months whether or not the employee is Hospital Confined. Your maximum benefit period under this Provision will end May 23, 2001."[1]

Joint App. at 96. Defendant noted that Plaintiff was working part time and applied a "Work Adjustment Benefit."

As noted, the letter addressed to Plaintiff approving benefits specifically stated that benefits would only be payable for twenty-four months and that the maximum benefit period under the provision would end on May 23, 2001. Joint. App. at 98–100. As a requirement for Plaintiff to continue receiving disability benefits, Plaintiff was required to fill out a form entitled "Supplemental Proof of Loss (Monthly Income Statement)" once a month. Additionally, Defendant required Attending Physician Statements to be submitted on a regular basis. On October 8, 1999, Plaintiff filled out Supplemental Proof of Loss forms for May, June, July, August, and September 1999. Under a heading requesting a list of factors that caused Plaintiff's earnings to be less than they were prior to disability, Plaintiff wrote on the September form, "Lack of concentration and short term memory problems, sleep problems associated with Clinical Depression." *Id.* at 109. On each subsequent form, Plaintiff identified the cause of reduced earnings as "Clinical Depression." *Id.* at 111–13. Statements signed and presented to Defendant in months subsequent to September 1999 also cited "Clinical Depression" as the cause of Plaintiff's reduced earning capacity. *See id.* at 152, 156, 184, 241, 287, 292. Along with each Supplemental Proof of Loss Form, Plaintiff provided copies of paystubs from his part time employment, first from Manpower, and later from United Parcel Service.

On May 26, 2000, Plaintiff was notified that his case was being closed. This apparently was the result of an Attending Physician Statement filed by Ashby which stated that Plaintiff could resume work without restriction on June 1, 2000. *See* Joint App. at 253. Dr. Parulekar wrote the Defendant on June 30, 2000, stating his belief that Plaintiff was still disabled and expressing his disagreement with the determination that Plaintiff's long term disability benefits would be terminated. Dr. Parulekar noted:

> [O]ver the past year he has had significant difficulties concentrating, remembering, feeling tired, low and irritable

---

[1]. While the letters to Plaintiff indicated that benefits were limited to conditions "caused or contributed to by a Mental Disorder," the policy actually provides that benefits are limited when a disability is "caused by a Mental Disorder." Defendant does not assert that Plaintiff is ineligible for benefits if his disability was merely "contributed to" by a mental disorder.

moods, and sleep disturbances. For a while, his depressive symptoms improved to some extent. However, he has had a recurrence of his depression which has required switching of his antidepressant medication. Also, because of his inability to handle any additional stress, which would accentuate his impairments, I had recommended that he not work full-time. I will be referring Mr. Thomas Paulson to a neurologist to evaluate his sleep, concentration and memory problems, as it is causing considerable difficulties at home, and has not responded adequately to my interventions.

*Id.* at 263.

Ashby also wrote a letter stating that his prior assessment regarding ability to work without restriction was in regard to Plaintiff's work at UPS and was not in relation to his ability to return to his previous employment as a restaurant manager. Joint App. at 264. Ashby noted that Plaintiff's ability to manage stress, to concentrate, remember, and function at his previous level of competence was still impaired. *Id.* On August 1, 2000, Plaintiff formally requested an appeal of the termination of his benefits, as did his wife. *Id.* at 265–66. It appears that Defendant reconsidered its position and resumed payment of benefits to Defendant, including payments for those months when benefits had been terminated.

In early 2001, Plaintiff's wife and the Defendant began discussing the possibility that Plaintiff's claim was caused by a physical condition. *See* Joint App. at 315, 329, 342, 353. Defendant's representatives offered suggestions to Plaintiff's wife for submitting the claim and explained that, at worst, the claim would be denied and Plaintiff would have the right to appeal and request additional time to submit objective testing. *Id.* at 315. Plaintiff also began pursuing a worker's compensation

case in this time period, and hired an attorney to represent him in regards to the January 1, 1999 slip and fall. On May 1, 2001, Plaintiff's wife sent a letter to Defendant stating, "[W]e are aware that the Maximum Benefit Period for Tom's Mental Disability claim will be reached on May 23, 2001. We wanted to inform you that we plan to appeal and have the status changed to a Physical Disability Claim." *Id.* at 353. On May 7, 2001, Plaintiff's wife informed Defendant that she would arrange with Plaintiff's worker's compensation attorney to "send in all physical information (relating to an organic brain injury) for [Defendant] to review." *Id.* at 355.

On June 1, 2001, Defendant notified Plaintiff that the maximum term of benefits had been reached. "As a courtesy to you, based on previous discussions regarding the possibility of a condition not subject to the 24 month limitation, we will keep your claim open for a period of 60 days . . . ." Joint App at 360. The Administrative Record shows, however, that despite this extension, Plaintiff did not contact Defendant again until April 3, 2002. A letter written by Plaintiff's wife stated the following:

> I have enclosed the medical documents that are needed to prove that my husband's head injury of Jan. 1, 1999 is the cause of his continued problems and also of the depression that continues to impact all of our lives. The reason that I was unable to obtain the necessary documentation in the 90–day time frame is due to the fact that we were attempting to get the Workers Compensation Insurance Carrier for Embers Restaurant to pay for this very costly Neuropsychological Exam . . . .

*Id.* at 403. Enclosed with the letter was a neuropsychological assessment report, dated January 7, 2002 by Dr. Kenneth Mills. Though the appeal and documentation

were submitted late, Defendant agreed to evaluate Plaintiff's claim in light of the new information and began efforts to obtain Plaintiff's medical records. *See id.* at 404, 407, 409–412.

In Dr. Mills' report, based on assessments of the Plaintiff on December 18, 26, and 27, 2001, Mills outlined Plaintiff's slip and fall on January 1, 1999, as well as the self-inflicted injuries sustained on February 18, 1999. Mills noted that an MRI of the brain, without contrast, was conducted on December 29, 2000 and indicated "a possible small area of encephalomalacia [2] in the left insular white matter, but was otherwise unremarkable." Joint App. at 389. Mills also detailed Plaintiff's report of the course of events after hitting his head in January 1999:

> The client complained that initially after hitting his head (in the fall at the restaurant) he was unable to read more than a few pages of text without falling asleep. That condition has now improved, however, and he is able to read a novel in several sittings. Mr. Paulson stated that his expression of anger has increased[d] subsequent to his head injury. He indicated that he "got angry all the time" at home, to the extent that his children avoided him. He stated that his angry outbursts have now diminished "because I don't have any stressful situations, usually . . . ."
>
> He recalled that he was able to "get by" on 5 or 6 hours of sleep before he hit his head, but that now he need[s] 8 hours sleep per day to adequately function. He stated "I think everything I was having problems with before (the head injury) was magnified by my hitting my head, but there was a whole year and a half before the accident where my sleep patterns were messed up. I couldn't have done book work those last few

years, I'd fall asleep. I was doing a 24 hour shift at least once per week."

*Id.* at 387–91. With regard to current symptoms, Plaintiff told Dr. Mills that he suffered from difficulty concentrating, impaired memory, word finding difficulty, emotional liability, and depression. Plaintiff also indicated that he frequently misplaces items and stated his belief to Dr. Mills that, "the cause of these difficulties [is] a closed head injury [ ] sustained as a result of a fall at work on 1/1/99." *Id.* at 370, 387.

Dr. Mills conducted a variety of psychological tests on Plaintiff. Dr. Mills indicated a moderate concern over Plaintiff's Auditory Delayed Memory and a significant concern over Plaintiff's Visual Immediate Memory, Visual Delayed Memory, and a moderate to severe depression. Joint App. at 370. Dr. Mills surmised that Plaintiff's "performance reflects impairment in retrieval function, and not in storage." *Id.* at 369. Dr. Mills ultimately stated:

> This gentleman's demonstrated cognitive impairments may reflect diffuse injury to the occipital and parietal lobes, possibly resulting from his head injury. Such injury may not be discernable in MRI imaging, and he may wish to consider the use of Positron Emission Tomography to image areas of decreased function.
>
> Mr. Paulson's anxious depression appears to have predated his traumatic head injury, and seems to have resulted from a history of overwork at his position of restaurant manager. This anxious depression was complicated by his injury on 1/1/99. The depression, in turn, has likely exacerbated his demonstrated cognitive impairments.

---

**2.** Webster's Dictionary defines "encephalomalacia" as a "softening of the brain due to degenerative changes in nervous tissue." Webster's 3d New Int'l Dictionary (1961).

*Id.* at 368–69. In a letter to Plaintiff's attorney, Dr. Mills stated:

It is my professional opinion, to a reasonable degree of medical certainty, that Mr. Paulson experienced an anxious depression which appears to have predated the head injury he sustained on 1/1/99, and which was probably directly related to the stress and overwork of his employment as restaurant manager. The cognitive impairments which this gentleman demonstrated during the assessment sessions appear to reflect a combination of the sequelae of his head injury and the effects of his anxious depression. As a result of his cognitive difficulties, Mr. Paulson appears unable to successfully perform the responsibilities of either the position of restaurant manager or any employment which would require a high level of abstract concentration;, memory, procedures and detail, and/or administrative responsibility . . . .

In summary, Mr. Paulson appears to demonstrate significant compromise of cognitive abilities, secondary to both head injury and a pre-existing anxious depression.

Joint App. at 398.

It appears from the record that Plaintiff also submitted for consideration the opinion of Charles Denhart, M.D. *See* Joint App. at 399. There is no medical documentation in the record underlying Dr. Denhart's opinion, however, in a letter dated March 25, 2002, Dr. Denhart stated:

Mr. Paulson is a 44 year-old man who I had seen approximately two years ago following a fall in which he struck his head in February of 1999. Following that time he had difficulty with memory, concentration, an increased desire for sleep, and an ease to anger, as well as depression. I have also reviewed his neuropsychological evaluation performed by Dr. Kenneth Mills in December of 2001. I believe that Mr. Paulson has had a closed head injury with resultant cognitive deficits, primarily affecting his memory, and that this is related to his fall on 02/18/99 [sic]. With respect to his depression, this appears to have pre-existed the fall, but was exacerbated by the effects of the fall.

*Id.*

The record also reflects that approximately two months before seeing Dr. Mills, Plaintiff received the report of a clinical neuropsychologist, Jim Andrikopoulos. Dr. Andrikopoulos performed a neuropsychological evaluation and interview with the Plaintiff on October 19, 2001 and recorded his findings in a letter dated November 11, 2001. Relevant findings of Dr. Andrikopoulos include:

**Impression**

1) *Cognitive Functioning:* In the context of overall average intellectual functioning, this patient has no deficits associated with his concussion.

2) *Psychological Functioning:* The personality testing revealed a profile often seen in patients with a somatoform disorder. When seen in the absence of such a disorder and in the context of litigation, it may suggest the exaggeration of somatic symptoms.

3) *Clinical Interview:* Outlined in the Comment section of the report are aspects of this patient's subjective complaints that are incompatible with a post-concussive syndrome.

Joint App. at 506. The following represents excerpts from Dr. Andrikopoulos' detailed commentary on his findings:

As is usually the case in such injuries, patients often complain of impairment that neuropsychological testing does not corroborate, especially so long after the injury. The general course with patients who have sustained a mild head

injury, concussion or whiplash injury is that there are some post-concussive symptoms that generally accompany the injury and last a few weeks and then generally go away. There may also be some minor impairment on tests of vigilance, rate of information processing and memory. Physically, cognitively and psychologically the majority of such patients return back to premorbid levels of functioning in a few weeks.

Also, whether the patient is in litigation also plays a role in the maintenance of these symptoms. It is rare to receive referrals for neuropsychological testing for patients with mild concussion, head injury, or whiplash injury who present with multiple, persistent post-concussive symptoms who are not involved in litigation.

There are two aspects of this evaluation of note .... In the case of post-concussive syndrome, symptoms occur shortly after the accident. In this particular case, they occurred in April or May of the same year, nearly three months after the accident at which point they should have resolved. For example, the patient indicated cognitive difficulties at that time when he was taking some exams for a job interview. At that time, he was already depressed and unhappy with his job and seeking treatment.

The second aspect of his testing that is a little bit unusual is how he replied when I asked if he had noticed any changes in his language or any distortion in his vision. He admitted to these symptoms but indicated that he recognizes them only now that I asked him, indicating he had never been asked these questions before; and, now that he thinks about it, he does have difficulties in these areas. A couple of explanations for this are that the patient is highly suggestible and prone to somatization, which can be supported by the personality testing. Additionally, it is common to see in litigation cases instances of the patient reporting for the first time that were never reported before.

The last point that I would like to make in regard to this patient's symptoms is the correlation that has been made between these symptoms and the head injury. It seems clear from the records that the patient was dissatisfied with his job. He had a number of financial and family stressors and there are some health problems in his family. This patient was not happy with his job and was seeking treatment for this continuously for nearly two years before somebody had suggested to him that this may be related to a head injury. Mild concussion and major depression are two very common phenomena. I would imagine it would be possible for a patient to be clinically depressed; and, in the course of that depression accidentally slip and fall and strike his head. Implying at a much later point (e.g., two years later) that all these problems are due to the patient striking their head is a fallacious association .... I asked the patient why he was depressed. He responded, "I had a full-time job, and now I was a bum." That is why the patient was depressed. Unfortunately, he has attributed this to a minor concussion that does not bear any relevance to his current condition .... In my ten years of research and clinical practice seeing mild head injury patients, I have never run across a situation in which an inference that depression was caused as a result of a remote mild concussion. This situation is most unusual.

The second aspect of the evaluation aside from his subjective complaints is that of the personality testing. There is some suggestion of somatization. That is to say that his problems are psychological, or somehow stress manifested by hypochondriacal symptoms.

Joint App. at 500–06. Dr. Andrikopoulos also comments that, "any inference that the total disability is due to a minor concussion would be inadequate ...." and that "Dr. Denhart's comments that he believes that the patient's emotional symptoms are related to the fall do not reflect the reality of the history." *Id.* at 504. Additionally, Dr. Andrikopoulos stated, "I think that the patient is depressed given his life circumstances. For this, he should be treated; but, as I indicated earlier, it has nothing to do with the head injury." *Id.* at 501.

Additional documentation offered by Plaintiff in support of his claim that a physical injury was the cause of his depression includes a letter written July 2, 2002 by Dr. Parulekar. In his letter, Dr. Parulekar states, "I believe that his problems with clinical depression, anger and impaired cognition have resulted from a combination of work related stress and the head injury sustained at work in Jan. 1999." Joint App. at 493.

Armed with all of Plaintiff's medical documentation, Dr. Tom McLaren, Defendant's neuropsychological consultant, determined that no organic component to Plaintiff's depression was supported by the medical evidence. Joint App. at 520–21. Dr. McLaren noted that Plaintiff saw Dr. Andrikopoulos only two months prior to seeing Dr. Mills, yet performed worse on tests that were repeated at the evaluation by Dr. Mills. Dr. McLaren also pointed out that Dr. Mills did possess Dr. Andrikopoulos' evaluation, but did not compare those findings to his own or even comment on Dr. Andrikopoulos' findings. Specifically, McLaren cited a reference in Dr. Mills' report indicating that when Mills attempted to administer a test of executive functioning, Plaintiff stopped Dr. Mills, reported that he recalled the test from his prior evaluation by Dr. Andrikopoulos, and described the test and the methods for correct problem solution. Dr. McLaren found

this notable because of Plaintiff's excellent and detailed memory of events two months prior, which is contradictory to Plaintiff's assertions that he could not recall conversations or whether someone might have telephoned. Also relevant to Dr. McLaren's findings were the fact that Plaintiff's memory function seemed to vary with stress levels, indicative of a reactive rather than organically based problem, and the fact that Plaintiff has a documented history of sleep problems, which are known to impair short-term memory, attentional processes, and recall. *Id.* at 432–35.

Ultimately, Defendant sent Plaintiff a letter on December 4, 2002, stating, "Our in-house clinicians have reviewed the new information you submitted and it would appear the new information does not change our original determination." Joint App. at 526. The letter went on to state that Plaintiff's file had been referred to the Quality Review Unit, where an appeals consultant would make a review. "In the interim, please feel free to direct any questions or concerns to [the Quality Performance Unit]. We will make a final determination on your appeal within 60 days from receipt of the request if at all possible." *Id.* Plaintiff received a favorable decision on his worker's compensation case on December 5, 2002, but did not forward a copy of the decision to Defendant, despite a letter from Defendant dated December 6, 2002 indicating that Plaintiff's "appeal is still pending." *Id.* at 527. Two more letters referencing the continued pendency of Plaintiff's appeal were mailed on December 30, 2002 and January 29, 2003. *Id.* at 528–29. Finally, on February 2, 2003, the appellate department mailed Plaintiff a letter indicating that the review process had determined that no additional benefits were warranted under the terms of the policy because the notion that a head injury was the cause of Plaintiff's disability was unsupported. *Id.* at 530–34. Plaintiff

filed the present Complaint on April 30, 2003.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990).

"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda General Hospital*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of the rule is not "to cut litigants off from their right of trial by jury if they really have issues to try," *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried," *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers International, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y.1975)).

■ The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving par-

ty must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed. R.Civ.P. 5(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the require-

ment is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*[3]

3. At least one Court has noted that the summary judgment procedures set forth in Rule 56 are inapposite to the standards of review available to courts reviewing ERISA benefits determinations:

> As articulated by the United States Supreme Court, the function of a district court at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A district court accomplishes this task by determining whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."
>
> The preceding analysis illustrates precisely why the concept of summary judgment is inapposite to the adjudication of an ERISA action. Because this court's precedents preclude an ERISA action from being heard by the district court as a regular bench trial [because that would permit consideration of evidence not presented to a plan administrator], it makes little sense to deal with such an action by engaging in a procedure designed solely to determine "whether there is a genuine issue for trial."
>
> We suspect that the summary-judgment mode of analysis has been uncritically utilized time and again because district courts tend to concur with the ruling of the administrator in an ERISA action. In such a case, no harm is done by entering summary judgment in favor of the administrator. If, on the other hand, a district court rejects the ruling of the administrator, the district court would then have to independently weigh the evidence in the administrative record and render de novo factual determinations. There thus appears to be no benefit in having the district court first filter the

administrator's ruling through a summary-judgment strainer.

> Rule 56 is designed to screen out cases not needing a full factual hearing. To apply Rule 56 after a full factual hearing has already occurred before an ERISA administrator is therefore pointless.

*Wilkins v. Baptist Healthcare System, Inc.* 150 F.3d 609, 619 (6th Cir.1998) (Gilman, J., dissenting).

Interestingly, there is very little case law evaluating the issue raised by the dissent in *Wilkins.* Certainly, careful consideration of the issue would lend credence to the theory that summary judgment is not an appropriate vehicle, or at best a misnomer, for review of administrative decisions under ERISA benefit plans where the plan does not offer discretionary authority to the plan's administrator. When such discretionary language is absent, the reviewing court must make its determinations using a de novo standard of review, which necessarily applies to the factual determinations as well as to the legal conclusions of the plan administrator, even though such an approach is contrary to the general standards of review for motions for summary judgment. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see generally Ghattas v. United States of America,* 40 F.3d 281, 286 (8th Cir.1994) (a de novo standard of review in ERISA cases requires the court to " 'make an independent determination of the issues.' ") (citing *United States v. First City Nat'l Bank of Houston,* 386 U.S. 361, 368, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967)); *Rowan v. Unum Life Ins. Co.,* 119 F.3d 433, 435 (6th Cir.1997). Despite the apparent inconsistencies in the "summary judgment standard of review" and the "ERISA standard of review," this Court will apply the law of *Firestone* and its progeny where appropriate.

## III. LAW AND ANALYSIS

### A. *The Plan Documents and Purported Summary Plan Description*

 Plaintiff's Complaint in this matter arises under the authority of 29 U.S.C. § 1132(a)(1)(B) which entitles plan participants and beneficiaries to sue to recover benefits due under the terms of a plan. ERISA requires that every employee benefit plan "be established and maintained pursuant to a written instrument." 29 U.S.C. § 1101(a)(1). ERISA further requires that a written plan contain certain features including, inter alia, a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan, a description of the procedures for administering and amending the plan, and a specific description of the basis upon which payments are made to and from the plan. 29 U.S.C. § 1102(b)(1)–(4). More than one document may comprise an ERISA plan. *Eardman v. Bethlehem Steel Corp. Employee Welfare Benefit Plans,* 607 F.Supp. 196, 207 (W.D.N.Y.1984); *Myron v. Trust Company Bank Long Term Disability Benefit Plan,* 522 F.Supp. 511, 519 (N.D.Ga.1981), *aff'd,* 691 F.2d 510 (11th Cir.1982). However, promises not contained within an ERISA plan document are not actionable under ERISA. *In re Gulf Pension Litigation,* 764 F.Supp. 1149, 1213 (S.D.Tex.1991).

ERISA requires that welfare benefit plans be governed by formal written plan documents that are prepared and filed in compliance with ERISA's reporting and disclosure rules.[4] One such document, the Summary Plan Description, or SPD, is the statutory plain-language mechanism for informing plan participants of the terms of the plan and its benefits. ERISA provides that the plan administrator must furnish the SPD to each participant and beneficiary. *See* 29 U.S.C. §§ 1021(a)(1), 1024(b). ERISA does not define the term "Summary Plan Description." Instead, it sets out with great specificity how the SPD must be written and what information it must contain. These requirements are found in §§ 1022(a) and (b):

(a)(1). A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title. The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan . . . .

(b). The plan description and summary plan description shall contain the following information: The name and type of administration of the plan; the name and address of the person designated as agent for the service of legal process, if such person is not the administrator; the name and address of the administrator; names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator); a description of the relevant provisions of any applicable collective bargaining agreement; the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are

---

4. The term "welfare benefit plan" is defined at 29 U.S.C. § 1002(1), and in the Department of Labor's regulations at 29 C.F.R. § 2510.3–1(a)(2).

provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; the procedures to be followed in presenting claims for benefits under the plan and the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 1133 of this title).

29 U.S.C. § 1022. ERISA also requires that the plan administrator file the SPD with the Secretary of Labor. Assuming the Secretary finds it adequate under the law, the SPD is available for public inspection.

Department of Labor ("DOL") regulations significantly extend and amplify ERISA's statutory requirements on the types of information that must be contained in the SPD. For example, even though § 1022(b) does not explicitly require such information, DOL regulations require that the SPD include a "statement of ERISA rights," the employer identification number assigned by the Internal Revenue Service to the plan sponsor, and the plan number assigned by the plan sponsor. Unlike the code scheme of ERISA itself, however, DOL regulations clearly identify those categories of information relevant only to pension benefit plans. Numerous of those requirements are inapplicable in a case such as this one based upon welfare benefits.

■ To constitute an SPD, then, a document must be "sufficiently accurate and comprehensive to reasonably appraise[ ] participants and beneficiaries of their rights and obligations under the plan" and must contain specific information, including:

* the name and type of the plan;
* the name and address of the agent for service of process;
* the name and address of the plan administrator;
* the plan's eligibility requirements;
* circumstances which may result in disqualification, ineligibility, or denial or loss of benefits;
* the source of the plan's financing;
* the plan year; and
* claims procedures and remedies available for redress of denied claims.

*Palmisano v. Allina Health Sys., Inc.,* 190 F.3d 881, 888 (8th Cir.1999); 29 U.S.C. § 1022(a), (b). An SPD must also have information required by the DOL regulations:

* the name and address of the employer whose employees are covered by the plan
* the employer identification number assigned by the internal Revenue Service to the plan sponsor and the plan number assigned by the plan sponsor;
* the type of administration of the plan, e.g. control administration, insurer administration, etc.
* the phone number of the plan administrator;
* a statement that service of legal process may be made upon a plan trustee or the administrator
* the name, title and address of the principal place of business of each trustee of the plan;
* a description or summary of the benefits;
* the date of the end of the year for purposes of maintaining the plan's fiscal records;

29 C.F.R. §§ 2520.102–2, 102–3.

■ The key dispute in this matter is whether a "Certificate," issued by Defendant, constitutes an SPD for purposes of ERISA. Defendant argues that the "Certificate" constitutes a Summary Plan Description, or at a minimum, a relevant plan

document, because it contains "substantially all" of the information required under ERISA and the corresponding regulations. Plaintiff counters that the Certificate is not a Summary Plan Description, nor is it a relevant plan document, because it does not satisfy "all" the requirements for an SPD under ERISA and because the Policy issued to Mr. EMS Systems Inc.[5] specifically states that it is comprised of only the policy itself, the application of the policyholder, the applications of participating employers, and the applications of each employee.

Plaintiff cites *Palmisano* in support of his proposition that all the information defined in ERISA and the regulations are necessary for a document to constitute an SPD. In *Palmisano,* the Court of Appeals found that the document there alleged to be an SPD hopelessly failed because it contained only one item required by ERISA. The Court found, "The summary provided was so thoroughly lacking in the required detail that it cannot be deemed even a faulty SPD." *Id.* (citing *Pisciotta v. Teledyne Indus., Inc.,* 91 F.3d 1326, 1329–30 (9th Cir.1996) (booklets lacking ten of twelve statutory elements did not constitute SPDs)).

While some courts have adopted the view that the lack of all or substantially all of the information required by ERISA and the related regulations is not fatal to a finding that a particular document constitutes an SPD, *see e.g., Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310 (3d Cir.1991) (adopting a four-factor test to determine whether a document constitutes an SPD, including consideration of whether a document contains the information required by ERISA), the majority of courts have held that a document must substantially or completely comply with

Section 1022(b) and the corresponding regulations to be deemed an SPD.

The Fifth Circuit Court of Appeals, for example, has held:

> [T]he appropriate test for determining if a document constitutes an SPD under ERISA is to see whether it contains all or substantially all categories of information required under 29 U.S.C. § 1022(b) and the DOL's regulations at 29 C.F.R. § 2520.102–3 for the type of benefit in question. We emphasize that DOL's regulations at § 2520.102–3 are especially critical to this determination because they expand on the requirements in § 1022(b) and clarify the information required for each of type of benefit plan.

*Hicks v. Fleming Companies, Inc.,* 961 F.2d 537, 542 (5th Cir.1992). Several other courts have adopted this approach. *See e.g., Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54 (4th Cir.1992) (ERISA provided a lengthy detailed list of what must be included in a summary plan description so that an agreement to provide a description of "the main benefits and requirements" could not reasonably be regarded as the equivalent of a summary plan description); *Etherington v. Bankers Life & Casualty Co.,* 747 F.Supp. 1269 (N.D.Ill.1990); *Thompson v. Federal Express Corp.,* 809 F.Supp. 950 (M.D.Ga.1992); *Liberty Life Assur. Co. Of Boston v. Kennedy,* 228 F.Supp.2d 1367 (N.D.Ga.2002).

The Eighth Circuit Court of Appeals, while never explicitly so holding, has indicated that a document must contain all or substantially all of the information required by ERISA and the regulations to qualify as an SPD. In *Maxa v. John Alden Life Ins. Co.,* 972 F.2d 980 (8th Cir.1992), a case involving a partial loss of health

---

**5.** Mr. EMS Systems, Inc. is the name of the parent company to Plaintiff's employer, Embers Restaurant.

benefits because a retiring employee did not apply for Medicare, the Court stated that ERISA sets forth the relevant requirements for a proper SPD. *Id.* The Court quoted language from Section 1022(a) stating that the SPD shall include the information set forth in Section 1022(b) and referred to language in Section 1022(b) requiring that the SPD contain information about circumstances which may result in disqualification, ineligibility or denial or loss of benefits. *Id.* Similarly, in *Palmisano,* the Eighth Circuit cited with approval the Fifth Circuit holding in *Hicks:* "If a document is to be afforded the legal effects of an SPD, such as conferring benefits when it is at variance with the plan itself, that document should be sufficient to constitute an SPD for filing and qualification purposes." *Palmisano,* 190 F.3d at 888 (citing *Hicks,* 961 F.2d at 542).

Indeed, the Eighth Circuit has distinguished between an SPD sufficient to confer specific rights and a faulty SPD, which is defined as "one that fails to meet 'the requirements of ERISA and its attendant regulations.' " *Marolt v. Alliant Techsystems, Inc.,* 146 F.3d 617, 621 (8th Cir.1998) (citing *Maxa,* 972 F.2d at 984). The distinction, of course, is that when a nonfaulty SPD conflicts with the terms of another plan document, it has often been said that the SPD governs. *See e.g., Jensen v. SIPCO, Inc.,* 38 F.3d 945, 952 (8th Cir.1994). "This rule of construction does not apply when the plan document is specific and the SPD is silent on a particular matter." *Id.* And, if a faulty SPD does conflict with other plan documents, a participant must generally show that he relied on or was prejudiced by the SPD's description of the plan's benefits. *Dodson v. Woodmen of the World Life Ins. Soc'y,* 109 F.3d 436, 439 (8th Cir.1997). Reliance or prejudice, however, is not required if the SPD is not "faulty." *Palmisano,* 190 F.3d at 887.

Defendant's "Certificate" specifies that the policy issued to Mr. EMS Systems, Inc. was one for long term disability insurance issued by the Paul Revere Life Insurance Company. The Certificate contains a section entitled "Important Notice" which specifies that the Paul Revere Life Insurance Company is the Claims Administrator for benefits contained in group policies issued to Plaintiff's employer. The Certificate includes a definition of employees who are eligible for long term disability insurance and a general description of benefits and the process used to calculate the amount of benefits. The Certificate also includes sections discussing disabilities that are not covered and some circumstances which may result in ineligibility for the program. Also included is a statement of the process whereby a covered individual may appeal a decision of the Claims Administrator and an address where appeals should be sent.

Notably, the Certificate does not represent that it is an SPD, nor does it include a statement of the source of financing for the plan, the date of the end of the year for fiscal records, the employee identification number of the sponsor of the plan, the phone number of the administrator, the names and addresses of the trustees of the plan, a statement of the type of administration of the plan, a statement that legal process may be made to a trustee or administrator, or the name and address of a designated agent for service of process. Additionally, under the heading, "How do I file a Claim?," the Certificate merely states, "you should follow the claims filing procedures set forth in Your group insurance booklet-certificate." According to the pleadings of the parties and the documents presented to the Court, the only "booklet-certificate" is the Certificate here discussed and the Certificate contains no further information about the process for filing a claim.

While clearly the Certificate in this matter contains substantially more information required by ERISA and Section 2520.102–3 than documents found to be completely lacking as SPDs in *Palmisano,* the lack of compliance with all the requirements of ERISA and the regulations is troubling. The language of Section 1022 is mandatory, *i.e.,* "A summary plan description of any employee benefit plan *shall* be furnished ... the summary plan description *shall* include the information described in subsection (b) of this section...." 29 U.S.C. § 1022(a) (emphasis added). As stated by the Fifth Circuit in *Hicks:*

> [W]we are unwilling to declare that a document could constitute an SPD under ERISA even though it does not satisfy the information requirements in § 1022(b) and § 2520.102–3, and, thus, would not be accepted by the Secretary of Labor for filing and publication. If a document is to be afforded the legal effects of an SPD, such as conferring benefits when it is at variance with the plan itself, that document should be sufficient to constitute an SPD for filing and qualification purposes. Quite simply, there should be no accidental or inadvertent SPDs.

*Hicks,* 961 F.2d at 542. Despite language stating that an SPD must contain "all or substantially all" of the information required by ERISA, the Court in *Hicks* left open the question of whether a document containing not all, but substantially all the information required under ERISA and the regulations might be an SPD:

> [W]e believe that such a case would be the exception not the rule. Such a situation might arise, for example, if a plan sponsor intends a document to be an SPD, states that it is an SPD, and includes in the document most information required under ERISA and its regulations, but, perhaps due to inadvertence, omits some small item of required information.

*Id.* at 542, n. 17. The Court also emphasized that the DOL's regulations at sec. 2520.102–3 are "especially critical to this determination because they expand on the requirements in Sec. 1022(b) and clarify the information required for each of type of benefit plan." *Id.* at 542.

After careful consideration, the Court believes that, while the Certificate at issue in this case contains slightly more information than did the document declared not to be an SPD in *Hicks,* it is still lacking too substantial an amount of information to constitute an SPD. Indeed, the Court cannot say that a document lacking at least three (perhaps four given the inadequate explanation of how to file a claim) categories of information required by section 1022 and that lacks numerous of the provisions required by the DOL regulations contains even "substantially all" of the information required to qualify as an SPD under ERISA.

### B. *Standard of Review*

■ The Supreme Court has determined, "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Defendant does not dispute that the master policy contains no statement conferring discretion upon it. Rather, Defendant asserts that language included in the "Certificate" confers discretionary authority to it, making an abuse of discretion standard of review appropriate.

Specifically, the Certificate provides in the "Important Notice" section:

> The Paul Revere Life Insurance Company is the Claims Administrator for benefits contained in the group policies it has

issued to Your employer. As such, it has the full, final, conclusive and binding authority to construe and interpret any of its group insurance policies that provide benefits under Your employer's welfare benefit plan as may be necessary to make any and all decisions and determinations under such policies. A decision of the Claims Administrator shall not be overturned unless it is arbitrary and capricious or unless there is no rational basis for the decision.

Additionally, the initial page of the Certificate reads:

Nothing in this booklet waives or alters any of the terms or conditions of the Group Policy. If the terms and conditions given in this booklet-certificate and the Group Policy should differ, the Group Policy will govern. The Paul Revere Life Insurance Company has final decision-making authority to determine eligibility for benefits and to interpret its Policy as may be necessary in order to make claims determination [sic].

Defendant urges that even if the Certificate does not constitute an SPD, it is at least a relevant plan document[6] and, therefore, the discretionary authority delineated in the Certificate mandates an abuse of discretion review. Plaintiff, on the other hand, argues that the Certificate is neither an SPD nor a relevant plan document and the appropriate standard of review is de novo.

The Court has determined that the Certificate does not constitute an SPD for purposes of ERISA.[7] Likewise, the Court cannot conclude that the Certificate is a relevant plan document for purposes of ERISA. The group long term disability policy itself states that the "entire contract is made up of this Policy, the application of the policyholder, applications of the Participating Employers, and application by each Employee." Joint App. at 564. While the policy does state that the insurer will "issue certificates of insurance for each insured Employee" for purposes of stating "what the insurance coverage is and to whom We pay benefits," the same provision notes, "If the terms of this Policy and the Employee's certificate differ, this Policy governs." Id. at 563. Additionally, the policy provides, "The certificate is not a part of the Policy. It does not modify or extend Our liability." Id. at 546. Further, "All changes that are made are stated in riders or amendments to this Policy. These documents must be signed by Our President and Secretary." Joint App. at 563. While the signature of the Defendant's President does appear within the Certificate itself, it only does so on a page which states, "Nothing in this Certificate waives or alters any of the terms or conditions of the Group Policy." Indeed, it is clear that Defendant knew the proper form for amending the policy because it did so, via formal amendment, including language stating "This amendment is hereby incorporated into and made a part of the said group policy or policies," on at least one occasion. See Pl.'s App. at 147.

To hold that the Certificate constitutes a plan document under circumstances that expressly contradict the plain language of the insurance contract would fundamentally undermine ERISA's requirement that each policy provide a procedure for amendment and that such amendments be in writing. See 29 U.S.C. § 1102(a)(1); see generally United Paperworkers Int'l Union v. Jefferson Smurfit Corp., 961 F.2d

---

6. Defendant offers no authority or support for the proposition that, if not an SPD, that the Certificate is a relevant plan document.

7. At the very best, the Certificate might be deemed a faulty SPD. Even were that the case, however, additional reasoning infra would preclude giving binding authority to the discretionary language.

1384, 1386 (8th Cir.1992) ("The ERISA requirement that terms of a welfare benefit plan be committed to writing was intended to insure that employees could rely on the terms of the formal written plan provided to them without fear that unwritten, contrary terms would later surface . . . . [Changes to terms] of welfare benefit plans can be given effect only if they are reduced to writing and incorporated into formal written ERISA plan provided to employees."). Defendant does not assert that the Certificate constitutes an amendment to the plan, but rather claims, without any support, that the Certificate must be deemed a relevant plan document and the discretionary language be given effect. The Court disagrees and finds that Defendant cannot grant itself discretion or otherwise broaden its authority in a document that is insufficient to amend the underlying policy and thus be considered a relevant plan document.

■ Even assuming, *arguendo,* that the Certificate constitutes a Summary Plan Description or a relevant plan document, the Court does not believe that the discretionary language in the Certificate mandates an abuse of discretion standard of review. Several courts have addressed precisely this type of issue. Leading the way is *Glocker v. W.R. Grace & Co.,* 974 F.2d 540 (4th Cir.1992). In *Glocker,* the Summary Plan Description stated that private-duty nursing would be covered under the policy only if the care was certified by a doctor as medically necessary and subject to the approval of Aetna, the plan administrator in the case. *Id.* at 542. The SPD also provided, "The official documents-not this booklet-will be used to resolve any question about benefits from the Plans." The master policy, however, did not require that private-duty nursing care be subject to the approval of Aetna in order to be covered. *Id.* The Court of Appeals found that the SPD itself provided the answer to which provision controlled:

"Grace, having represented to its employees that the Plan-not the handbook-governed questions about benefits, cannot now repudiate this representation and rely on statements in the handbook that are less favorable to Mrs. Glocker." *Id.*

The Fourth Circuit noted that, at first blush, this position may seem contrary to the well-accepted principle that the terms of an SPD will govern over contradictory plan language, even despite a provision in the SPD that designates the master policy or plan as controlling over any disputes. *Id.; see also Barker v. Ceridian Corp.,* 122 F.3d 628, 632 (8th Cir.1997). The reason for this rule, of course, is that if "[a] plan document required by law to be plainspoken for the benefit of 'average plan participant[s],' 29 U.S.C. sec 1022(a)(1), says one thing, and an obscure passage in a transactional document only lawyers will read and understand says something else . . . [t]he accessible provisions govern because "[a]dequate disclosure to employees is one of ERISA's major purposes." " *Jensen,* 38 F.3d at 952; *Marolt,* 146 F.3d at 621 (quoting *Barker,* 122 F.3d at 633). Recognizing the general rule, the Fourth Circuit noted the distinction as follows: "[I]n this case, where the handbook favors the employer, the employer cannot disavow a disclaimer in the handbook representing that the Plan controls; in *Pierce* [a case where the SPD was deemed controlling], where the Plan favors the employer, the employer cannot invoke the Plan by relying on a disclaimer in the handbook that, contrary to the intent of Congress, designates the Plan as the controlling document." *Id.* at 543 (citing *Pierce v. Security Trust Life Ins. Co.,* 979 F.2d 23, 27 (4th Cir.1992) (per curiam) ("if there was a conflict between the complexities of the plan's language and the simple language of the SPD, the latter would control"); *see also Barker,* 122 F.3d at 633 ("Summary plan descriptions are considered part of ERISA plan documents

.... Adequate disclosure to employees is one of ERISA's major purposes .... Because of the importance of disclosure, in the event of a conflict between formal plan provisions and summary plan provisions, the summary plan description provisions prevail.") (citations omitted); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir.1991) ("the summary plan description is binding, and ... if there is a conflict between the summary plan description and the terms of the policy, the summary plan description shall govern. Any other rule would be, as the Congress recognized, grossly unfair to employees and would undermine ERISA's requirement of an accurate and comprehensive summary.").

As the citations above indicate, the purpose of the rule favoring the SPD over other contrary plan documents is to fulfill the requirement of Congress that an SPD provide information to laypersons in easy to understand language:

> ERISA requires, in no uncertain terms, that the summary plan description be "accurate" and "sufficiently comprehensive to reasonably apprise" plan participants of their rights and obligations under the plan .... The rule that Continental urges would eviscerate this requirement. Under Continental's proposed rule the summary would not need to be accurate or comprehensive-if there was an ambiguity in the summary or an inaccuracy that put the summary in conflict with the policy, that ambiguity or inaccuracy would be cured by the policy itself. The result would be that before a participant in the plan could make any use of the summary, she would have to compare the summary to the policy to make sure that the summary was unambiguous, accurate, and not in conflict with the policy. Of course, if a participant has to read and understand the policy

in order to make use of the summary, then the summary is of no use at all. *Hansen*, 940 F.2d at 981–82.

As the Fourth Circuit recognized in *Glocker*, however, it is equally unfair to permit an insurer to present a document offering more restrictive coverage to its insureds than exists in the actual policy and then rely on a rule favoring the SPD to enforce the more restrictive coverage. Just as the rule allowing enforcement of SPDs helps to ensure that policy summaries are "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan," so does a rule requiring that favorable policy terms be enforced over more restrictive terms in an SPD.

Thus, in these types of cases, several courts have held that the plan language controls, particularly where the summary plan description contains a provision explicitly stating that the plan language takes precedence over summary plan description language in the event of a conflict between the two, and where the plan is more favorable to the employee than the summary plan description. *See Glocker*, 974 F.2d at 541–43; *Shell v. Amalgamated Cotton Garment and Allied Indus. Fund*, 871 F.Supp. 1173, 1179 n. 9 (D.Minn.1994), *aff'd*, 43 F.3d 364 (8th Cir.1994); *Sanders v. Scheideler*, 816 F.Supp. 1338, 1344 (W.D.Wis.1993), *aff'd*, 25 F.3d 1053, 1994 WL 234497 (7th Cir.1994); *Springs Valley, Bank & Trust Co. v. Carpenter*, 885 F.Supp. 1131, 1141–42 (S.D.Ind.1993) (stating that when terms of a summary plan description and policy conflict, the terms that favor the participant will govern, regardless of disclaimers). Without explicitly so holding, the Eight Circuit Court of Appeals appears to have approved the position of the *Glocker* court in *Sturges v. Hy–Vee Employee Benefit Plan and*

*Trust,* 991 F.2d 479, 480–81 (8th Cir.1993), noting that, "Although the plan summary is at odds with the plan, the summary states that the plan controls when the summary and plan conflict." *Id.* (citing *Glocker,* 974 F.2d at 542–43).

Defendant proffers as a last attempt to give effect to the discretionary language the proposition that there is no conflict between the Certificate and the policy because the policy is silent on the issue of discretion. This position is unavailing. The rule of construction referenced by Defendant generally applies to situations where a plan document is specific on an issue and the SPD is silent. *See e.g., Jensen,* 38 F.3d at 952. Giving effect to SPD language when no such language is included in the policy has the simple effect of broadening the terms of the policy. This is not the purpose of an SPD. An SPD is intended to be a *summary* of the policy. A summary, by its very definitions is a "short restatement of the main points." Webster's 3d Int'l Dictionary (1961). Thus, in its commonly understood meaning, a summary may well be expected to leave out some terms and detail, but cannot be expected to *add* terms not appearing in the document being summarized.

For the reasons discussed *supra,* the Court believes that giving effect to the discretionary language of the Certificate, whether or not it constitutes an SPD, would defeat the legislative purpose and intent of ERISA in ensuring that employees are accorded easy and *accurate* access to the terms of their welfare benefit cover-age. Accordingly, the Court finds the appropriate standard of review to be de novo.[8]

## C. *Reopening the Administrative Record*

Defendant argues that certain exhibits in Plaintiff's summary judgment appendix must be stricken from the record because they were not included in the administrative record of Plaintiff's claim. Specifically, Defendant finds objectionable Plaintiff's Exhibit 1 (Defendant's Answer to Interrogatory No. 8); Exhibit 2 (Mental/Nervous Limitation Page from Defendant's Claim Manual); Exhibit 3 Defendant's Answer to Interrogatory No. 13; Exhibit 4 (Arbitration Decision); and Exhibit 5 (Defendant's Responses to Requests for Production 9–10). Defendant also seeks to strike those portions of Plaintiff's Statement of Undisputed Fact to the extent that such statements are supported only by exhibits that were not part of the administrative record.

"Admission of evidence outside the administrative record is discouraged on de novo review; however, the district court may admit evidence outside the record in a denial of ERISA benefits case if the participant shows good cause." *Ferrari v. Teachers Ins. and Annuity Ass'n,* 278 F.3d 801, 807 (8th Cir.2002) (citing *Brown v. Seitz Foods, Inc. Disability Benefit Plan,* 140 F.3d 1198, 1200 (8th Cir.1998)). Such an approach is designed to " 'ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administra-

---

8. While the Court does not believe that an abuse of discretion review is appropriate under the facts of this case, it does note that summary judgment in favor of Defendant would be appropriate were such a standard applied. This is because, as determined in a different context *infra,* the decision of the plan administrator was reasonable. Under an abuse of discretion standard of review, limited to only the evidence before the administrator, the Court must affirm the benefits determination if "a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Cash v. Wal–Mart Group Health Plan,* 107 F.3d 637, 641 (8th Cir.1997) (quotation omitted).

tors.'" *Cash v. Wal–Mart Group Health Plan*, 107 F.3d 637, 641–42 (8th Cir.1997) (quoting *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir.1993)).

■ First, Defendant seeks to strike Exhibits 1, 3, and 5, Defendant's own answers to interrogatories. Plaintiff counters that the responses to interrogatories and requests for production are designed to assist the Court with its determination of the scope of review applicable to this case. The Court is mindful of the fact that Defendant has supplemented its responses to discovery. The Court accepts Plaintiff's position that the original answers are open for the Court's consideration because Defendant's supplemental responses were not made until well after the discovery deadline in the case. Additionally, the Court cannot say that consideration of these items expands the administrative record, that is, the record before the claims administrator in making its decision, in any way. Accordingly, the Court does not believe that these exhibits constitute the type of documents contemplated as expanding the administrative record such that they require a good cause showing for inclusion.[9] Additionally, the Court does not believe Defendant is prejudiced by these items remaining in the current record.

■ Defendant next seeks to strike the administrative decision from a worker's compensation case involving Defendant and Mr. EMS Systems, Inc. The arbitration decision was issued on December 5, 2002 and was concededly never presented to the administrator, nor was it part of the administrative record. Plaintiff does not dispute that he did not provide the opinion to Defendant, but argues that the burden

was upon the Defendant to obtain the decision because: 1) it knew that Plaintiff had a pending worker's compensation case; and 2) Defendant sent Plaintiff a letter on December 4, 2002 which stated that the additional information submitted by Plaintiff "does not change our original determination." For these reasons, Plaintiff claims that Defendant failed to develop the record and that the administrative record should be reopened to allow for consideration of the worker's compensation decision. The Court disagrees.

The Court is unable in this case, to discern any legitimate good cause for Plaintiff's failure to make the worker's compensation decision part of the administrative record. While true that one day prior to the decision, Plaintiff received a letter indicating that the administrator would be turning the file over to its Quality Review Unit and that the original determination had not changed, the history of Plaintiff's communications with Defendant indicates that Defendant was always willing to receive additional documentation. Indeed, the day *after* the worker's compensation decision, and again on December 30, 2002, and on January 29, 2003, Defendant wrote Plaintiff letters stating that his "appeal is still pending."

Plaintiff does not offer any reason why he did not submit the arbitration decision to be considered in his appeal when he clearly knew on prior occasions, in extremely similar circumstances, that he could do so. Additionally, Plaintiff does not contend that the worker's compensation decision would have impacted the determination of the claims administrator in his long term disability benefits case. In-

---

9. The Sixth Circuit has held that the rule discouraging admission of items that did not appear in the administrative record was intended to prevent the courts from looking past the evidence of disability-medical reports, correspondence, test results, and the

like-considered by the plan administrator, and never intended to suggest that the rule should cover the benefit plan itself which is in the nature of a contract." *See Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir. 2002).

deed, the worker's compensation decision was not binding upon the administrator in its own benefits determination. *See e.g., Moats v. United Mine Workers of America Health and Retirement Funds,* 981 F.2d 685, 689 (3d Cir.1992) (award of worker's compensation benefits to injured mine worker was of little or no significance for purposes of his subsequent action for disability pension under ERISA plan). The Court agrees with Defendant's proposition, "Had Plaintiff believed the evidence he now offers was necessary for Paul Revere to make a proper benefits decision, Plaintiff should have submitted this evidence to Paul Revere at that time. Having failed to do so, Plaintiff's offer of additional evidence at this point ... 'amounts to nothing more than a last gasp attempt to quarrel with [Paul Revere's] determination ....'" Def.'s Resistance to Pl.'s Mot. for Summ. J. at 11–12 (citing *Davidson v. Prudential Ins. Co.,* 953 F.2d 1093, 1095 (8th Cir.1992)). Accordingly, the Court does not believe Plaintiff has shown good cause to expand the administrative record to include the arbitration decision. The exhibit and all references thereto are hereby stricken from the record.

■ Finally, Defendant contends that the inclusion of its own policy manual page regarding the treatment of claims arising under the Mental/Substance Use Disorder limitation should be stricken because it was not part of the administrative record. Defendant claims that the document is peripheral to any interpretation for the Plan, as it was not part of the SPD or policy and is not binding on the claims administrator. Further, Defendant argues, Plaintiff has not offered any evidence indicating that the claim manual actually influenced Paul Revere's decision to deny his claim for benefits. Plaintiff, on the other hand, argues that Defendant produced the claims manual and this page specifically as an item of discovery that governs its procedures. The Court finds that an item held

by Defendant, and produced in discovery in the present litigation, could not reasonably have been part of the original administrative record. Defendant's argument regarding the binding authority of the document goes to the weight rather than the admissibility of the document and the Court finds no need to strike the document from the record.

### D. *The Policy Language*

■ Having determined that the appropriate standard of review is de novo, the Court must evaluate the record before the administrator and "'make an independent determination of the issues.'" *Ghattas v. United States of America,* 40 F.3d 281, 286 (8th Cir.1994) (citing *United States v. First City Nat'l Bank of Houston,* 386 U.S. 361, 368, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967)). The only issue remaining in this case is whether Plaintiff's disability was "caused by a Mental Disorder," and thus subject to a twenty-four month maximum benefit period pursuant to the terms of the policy.

Letters sent to Plaintiff by Defendant stated that the twenty-four month limitation applied to "any disability which is caused or contributed to by a Mental Disorder." *See e.g.,* Joint App. at 359. In fact, the Policy provides, "For any disability that is caused by a Mental Disorder or Substance Use Disorder, benefits are payable for up to twenty-four months whether or not the Employee is Hospital confined." *Id.* at 570. "No additional benefits are payable for any Disability resulting from a Mental Disorder and/or Substance Use Disorder." *Id.* The policy defines Mental Disorder as "any disorder classified as such in the Diagnostic and Statistical Manual of Mental Disorders, which is published by the American Psychiatric Association (APA). Such disorders include emotional or behavioral disorders ...." *Id.*

Plaintiff places great emphasis on the page from Defendant's policy handbook entitled "Mental/Nervous Limitation." Pl.'s App. at 8. That page provides, "If a claimant continues to be disable[d] due to a condition other than Mental Nervous/Self Reported beyond the end of the limitation period, the claim would continue. However any subsequent period of disability due solely to mental nervous/self report would not be covered as we have paid the maximum benefit under the limitation." Plaintiff contends that this means that only mental conditions which *solely* cause the disability are subject to the twenty-four month limitation. As a general matter, defendant does not dispute this point, making the policy manual of extremely questionable value. Indeed, Defendant, through the entire claims and appeals process, repeatedly informed Plaintiff that if he could prove his disability was the cause of some physical injury, he might continue to receive benefits under the plan.

 The determination for the Court, then, as it was for the administrator, is whether Plaintiff's disability was *caused by* a mental disorder, or whether it is the result of some organic brain impairment stemming from his fall on January 19, 1999. When an ERISA plan limits disability benefits for mental or nervous disorders, "the terms should be accorded their ordinary, and not specialized, meanings." *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 841 (8th Cir.2001) (citing *Brewer v. Lincoln Nat. Life Ins. Co.*, 921 F.2d 150, 154 (8th Cir.1990)). The *Walke* Court found that absent objective medical findings that disabling symptoms are caused by a physical disorder, a disability is subject to a limitation for mental disorders in an ERISA welfare plan. *Id.*

Plaintiff argues vehemently that he has offered ample objective evidence to support a conclusion that his disability was caused by the fall at work on January 1, 1999. Specifically, Plaintiff cites Dr. Mills' statement that Plaintiff's impairments "reflect a combination of the sequelae of his head injury and the effects of his anxious depression;" Dr. Mills' statement that the compromise of Plaintiff's cognitive abilities is "secondary to both head injury and a pre-existing anxious depression;" Dr. Denhart's statement, " I believe that Mr. Paulson has had a closed head injury with resultant cognitive deficits, primarily affecting his memory, and that this is related to his fall on [1/1/99]. With respect to his depression, this appears to have pre-existed the fall, but was exacerbated by the effects of the fall;" and Dr. Parulekar's statement, "I believe that his problems with clinical depression, anger and impaired cognition have resulted from a combination of work related stress and the head injury sustained at work in Jan. 1999." [10]

Defendant, on the other hand, points to numerous documents in the administrative record indicating that Plaintiff suffered from depression prior to his fall on January 1, 1999. Defendant also cites medical opinions, including those of Ashby, Dr. McLaren, and most notably of Dr. Andrikopoulos, which indicate no real evidence that Plaintiff's head injury had anything to do with his depression and disability. Defendant also points out that Plaintiff, his wife, Ashby, and Dr. Parulekar repeatedly stated over the course of approximately two years that Plaintiff's disability was the result of clinical depression.

It is clear from the record that Plaintiff suffered from numerous symptoms of his

---

10. Plaintiff also argues that Defendant's in-house neuropsychologist, Dr. McLaren, was self-admittedly incompetent to review a diagnosis of cognitive defects. The Court does not believe that a review of the records as a whole supports this allegation.

disability prior to slipping and falling at work. The notes of various treating and evaluating doctors indicate that Plaintiff had self-reported decision-making difficulties for some time prior to his head injury. Plaintiff admitted that his family life was stressful in regards to finances and having seven children, one with Down's syndrome, and another a right leg amputee. Plaintiff stated that he had experienced occasional problems with anger for five to six years and specifically told emergency room personnel that he had an explosive outburst approximately two years prior to February 1999. Plaintiff told medical personnel that he had suffered from irregular sleep patterns for some period of time prior to his head injury and that he was unable to perform book work in the last few years he worked for Embers without falling asleep. Even those doctors relied upon by Plaintiff in his claim, Dr. Mills and Dr. Denhart, agree that Plaintiff's depression predated his fall.

Since initially receiving treatment from Dr. Wilkins and Ashby, Plaintiff has taken antidepressant medication and participated in counseling or therapy sessions. It is clear from Plaintiff's treatment notes that his condition improved, diminished, and improved again over time, often corresponding to stressors in his family life. Upon pursuing a worker's compensation case and a determination by Defendant that a physical injury was the cause of his disability, Plaintiff obtained neuropsychological evaluations from two different doctors. Plaintiff first saw Dr. Andrikopoulos, who opined that the head injury had nothing whatsoever to do with Plaintiff's disability. Plaintiff then saw another neuropsychologist, Dr. Mills, who reached a contrary conclusion. It is notable, however, that Dr. Mills did not discuss Plaintiff's prior evaluation by Dr. Andrikopoulos in his report.[11]

The Court is thoroughly convinced that Plaintiff suffered from depression prior to and independent of his fall at work on January 19, 1999. The Court is also convinced that Plaintiff continued to suffer from depression throughout the time period reflected in the administrative record. The question, then, becomes, not simply whether Plaintiff's head injury caused or exacerbated the problem, but whether the head injury caused or exacerbated the problem to the extent that Plaintiff was still suffering from, and disabled by, the effects of the head injury beyond May 2001 when his benefits were terminated. The Court answers both questions in the negative.

In *Brewer v. Lincoln National Life Ins. Co.,* 921 F.2d 150 (8th Cir.1990), the plaintiff sought coverage under his employee welfare benefit plans for treatment of his son's affective mood disorder. Holding that the mental illness limitations in the plans at issue applied to the disorder, the Eighth Circuit Court of Appeals stated:

> The cause of a disease is a judgment for experts, while laymen know and understand symptoms. Laymen undoubtedly are aware that some mental illnesses are organically caused while others are not; however, they do not classify illnesses based on their origins. Instead, laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.
>
> Neither policy in this case limited the definition of "mental illness" to only those illnesses that have a non-organic origin, and the district court should not have adopted a definition that effectively imposed such a limitation. By focusing upon the disease's etiology, the district

11. Dr. McLaren pointed out troublesome as-pects regarding this issue in his own report.

court considered factors that are important to experts but not to laypersons. The court thus failed to examine the term "mental illness" as a layperson would have, which is the examination we conclude ERISA and federal common law require.

*Id.* at 154; *see also Lynd v. Reliance Standard Life Ins. Co.,* 94 F.3d 979 (5th Cir.1996) (adopting the same approach); *Equitable Life Assurance Soc. v. Berry,* 212 Cal.App.3d 832, 260 Cal.Rptr. 819, (1989) ("Manifestation, not cause, is the yardstick" for determining whether an illness is or is not a mental illness). The position of the *Brewer* court is entirely consistent with the oft-promulgated rule that, in interpreting the terms of an ERISA plan under a de novo standard of review, the Court must "giv[e] the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words." *Barker,* 122 F.3d at 632 (citing *Chiles v. Ceridian Corp.,* 95 F.3d 1505, 1511 (10th Cir.1996)).

Applying *Brewer* to the present case compels the conclusion that Plaintiff suffered from a disability due to a "mental illness," as that term is ordinarily understood and within the meaning of the term as defined in the disability policy here at issue. There is no doubt that the actual disability suffered by Plaintiff was major depressive disorder, characterized by inattentiveness; sad feelings, sleep disturbances, difficulty concentrating, and memory problems. He was diagnosed with the disorder and was treated with antidepressants and therapy. Indeed, even those doctors who assert that the head injury in some way contributed to the depression offered no specific treatment for the head injury. Rather the treatment for Defendant's disability is treatment for depression. There is equally no doubt that major depressive disorder qualifies as a "disorder classified as [a mental disorder] in the Diagnostic and Statistical Manual of Mental Disorders, which is published by the American Psychiatric Association (APA)." The Court concludes that a layperson, determining whether Plaintiff's condition is a mental disorder, would find that it is.

Even without resorting to an extreme analysis of the everyday meaning of the term "mental disorder," the Court would find, based upon all the evidence in the administrative record, there is little, if any, objective or reliable support for the notion that Plaintiff's head injury caused his depression and disability. In formulating this decision, the Court is particularly swayed by the medical report of Dr. Andrikopoulos, though it also finds portions of Dr. Parulekar's and Dr. McLaren's reports helpful. Factors which weigh most heavily against a finding of organic brain injury are as follows: 1) Dr. Mills noted that an MRI of the brain, without contrast, was conducted on December 29, 2000 and indicated "a possible small area of encephalomalacia in the left insular white matter, but was otherwise unremarkable." Joint App. at 389. Other than this MRI (noting that neither the tests nor the results themselves are part of the administrative record), Plaintiff had no tests to determine if any brain injury was visible, even though a PET scan was recommended by Dr. Mills; 2) Plaintiff self-reported to Dr. Andrikopoulos that he did not experience any depressive symptoms from the head injury until several months had passed. Dr. McLaren and Dr. Andrikopoulos both noted that this is inconsistent with brain trauma caused by a mild head injury; 3) Plaintiff was actively pursuing litigation at the time he received neuropsychological evaluations. Dr. Andrikopoulos opined that such litigation may, whether wittingly or unwittingly, have influenced Plaintiff's perception of his condition; 4) Dr. Parulekar, despite being

informed of Plaintiff's head injury early in Plaintiff's care, repeatedly diagnosed the Plaintiff with Major Depression, Single Episode. In fact, Dr. Parulekar did not opine until July 2, 2002 that Plaintiff's depression was caused by a head injury; 5) Dr. Denhart's opinion appears based exclusively on the report of Dr. Mills. There is no medical documentation underlying Dr. Denhart's opinion in the administrative record, nor is there any indication that he possessed any records other than Dr. Mills' at the time he formed his opinion. This substantially reduces the credibility of his conclusions; 6) Neither neuropsychologist recommended treatment for an organic impairment. Rather they suggested that Plaintiff continue with cognitive therapy and medication, implying that treatment for depression would be the resolve for Plaintiff's condition; and 7) Dr. Mills, Dr. Parulekar, and Dr. Denhart each opine that Plaintiff's head injury contributed to his depression and disability, but neither provides any explanation of how such head injury could have caused the problems complained of by Plaintiff, nor do they discuss the usual impact that head injuries have on patients, depressed or otherwise. Indeed, the Court finds that Drs. Mills, Denhart, and Parulekar, each baldly stated their opinion that Plaintiff's condition was caused by a physical injury without any real support or explanation whatsoever. Moreover, Dr. Mills' report stated that Plaintiff's disability *"possibly* result[ed] from his head injury," a proposition which does not fully support his later claims that the head injury was a cause of Plaintiff's disability to a reasonable degree of medical certainty.

The Court accepts the proposition that certain physical conditions could arguably not be defined as mental disorders under the reasoning of *Brewer*. For example, the destruction of part of an individual's brain, whether by a disease such as Alzheimer's or by an accident, might cause conditions which have symptomology similar to some conditions commonly classified as mental illnesses, but which should not, when given their ordinary interpretation, be classified as "mental disorders." However, in circumstances such as this one, where the mental disorder clearly and by all accounts predated any traumatic injury, and there is nothing other than opinion and speculation linking the head injury to the disability more than two years after the injury occurred, the Court simply cannot say that a "reasonable person in the position of the [plan] participant" would have "understood the words" of the policy to encompass a head injury so tangentially related to Plaintiff's ongoing disability. *See Barker*, 122 F.3d at 632 (citing *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir.1996)). Rather, a participant, giving "common and ordinary meaning" to the terms of the policy and the evidence in the record, would find that Plaintiff suffered from a mental illness within the meaning of the terms of the policy.

Indeed, were the Court to find, based on the evidence before it, that Plaintiff's head injury caused his disability, limitations for mental disorders in long term disability policies would fundamentally cease to have any application. This is so because virtually every individual with disabling depression would be able to circumvent the limitation regarding disabilities "caused by Mental Disorder" merely by having some physical event "exacerbate" the problem. This is not the intent of the policy in this case, of ERISA, or in accord with the plain and ordinary meaning of the language of this type of limitation or exclusion. Accordingly, the Court concludes that Plaintiff suffers from a mental illness subject to the twenty-four month limitation in his long term disability policy, pursuant to the both the generally accepted definition of "mental disorder," interpreted under by the Eighth Circuit in *Brewer*, and based on

the Court's own analysis of the policy terms and administrative record.

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion to Strike is GRANTED in part and DENIED in part. Additionally, having found no genuine issues of material fact, the Court finds that Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.